## JOHN KUPFER and Harland Kupfer v. JAMES McCONVILLE.

### (161 N. W. 283.)

**Contract — nonperformance — recovery — work and labor — contract price — failure to perform — conditions precedent — recovery cannot be had.**

1. Where one makes a contract with another to perform certain work at a stated contract price, and fails to perform or carry out his part of the contract and perform precedent conditions incumbent on him to perform, no recovery can be had on such contract for the contract price by reason of such nonperformance.

**Mechanic's lien — contract — based on — performance — must be — when lien attaches — foreclosure.**

2. Where a mechanic's lien is claimed by reason of the alleged performance of a certain contract, and it is found there was no performance of such contract, such mechanic's lien never attached or became a lien, and therefore there is no lien upon which foreclosure can be had.

Opinion filed January 22, 1917.

Appeal from a judgment of the District Court of Dickey County, HON. *Frank P. Allen*, J. Plaintiffs appeal.

Affirmed.

. *F. J. Graham* and *E. E. Cassels,* for appellants.

A contract must be so interpreted as to give effect to the mutual intention of the parties at the time, so far as same is lawful and ascertainable. Comp. Laws 1913, § 5896.

The intention of the parties to a written contract must, as a general rule, be ascertained from the instrument itself. Comp. Laws 1913, § 5899.

The whole contract must be real and considered together. Comp. Laws 1913, § 5901.

The contract must receive such a construction as will make it lawful, operative, and definite and capable of being carried out. Comp. Laws 1913, § 5903.

But a contract may be explained by reference to the circumstances under which it was made and to its subject-matter. Comp. Laws 1913, § 5907.

*W. S. Lauder,* for respondent.

Where a trial *de novo* is asked, the appellant must specify in his statement of the case that he desires a review of the entire case in the supreme court, and the trial judge's certificate must state that the statement contains all the evidence and proceedings had on the trial. Supreme Court Rule 31; Rev. Code 1905, § 7229; Comp. Laws 1913, § 7846; Laws 1913, chap. 131.

The rule that extrinsic evidence cannot be offered to vary the terms of a written contract has no application here, because the contract was admittedly partly written and partly oral, and especially where the oral evidence does not change the writing, but adds to and explains it. 17 Cyc. 741 et seq. and note.

GRACE, J. This action is one for the foreclosure of an alleged mechanic's lien, and appellant desires a review of the entire case in this court, and the case is here for trial *de novo*.

The complaint in the case is to the effect that on the 13th day of September, 1913, plaintiffs and defendant entered into a contract wherein the plaintiffs agreed to dig and sink a well on the northeast quarter of section 4, township 129 and range 65, in Dickey county, North Dakota, at the agreed price of $700, to be paid when the well was completed; said well was to furnish water reasonably clear and suitable for use with

a pump, in case water would not flow from said well. The well was to be piped with standard pipe of 2 inches in diameter.

The plaintiffs commenced digging said well on November 1, 1913, and completed the same on November 25, 1913, and, at the time of the making of said contract for digging said well, defendant was the owner of the land described in the complaint; that on the 24th day of December, 1913, within ninety days of the completion of said well upon said land, the plaintiffs duly filed in the office of the clerk of the district court in Dickey county, a just and true account of the amount claimed to be due plaintiffs. That on the 24th day of December, 1913, the plaintiffs gave personal notice in writing to the defendant of their intention to foreclose such lien; that the plaintiffs were at certain other costs for preparing and filing said mechanic's lien, and the notice aforesaid and the costs of serving same, and demanded judgment for the sum of $700, and for the cost of filing their claim and preparing and serving the notice, and demanding that their account so filed and claim of lien be adjudged a lien upon the land described in the complaint; that the premises be sold and the proceeds applied to the discharge of the demand of the plaintiffs. To which complaint the defendant answered in effect, admitting the partnership of the plaintiffs, and further admitting that on the 13th day of September, 1913, plaintiffs and defendant entered into a contract wherein plaintiffs agreed to dig or sink a well upon the real estate described in the complaint at the agreed price of $700 to be paid at the time the said well was completed according to the terms of said contract or agreement; said well was to furnish water in reasonable amounts and in all ways suitable for stock and domestic purposes. That the plaintiffs agreed to sink the well to sufficient depth to reach the artesian water level in the vicinity of the land in question for the sum of $700; that the plaintiffs agreed to furnish to defendant an artesian well or a well that would flow water by its own force, provided that such a well could be obtained by going down to the depth at which artesian flow wells in that vicinity were sunk; and that in the event that an artesian flow well could not be obtained by going down to said level, then the well should be equipped with a pump so that the water could be raised by means of a pump.

Defendant further alleges that the said plaintiffs did not sink said well to the depth to which artesian flow wells were sunk in that neigh-

borhood, nor within 100 feet of said depth, and that plaintiffs therefore have not completed their said contract. Defendant further alleges that he never accepted said well as a completed well, and has never agreed to pay for the same, and that the said well has never been completed in accordance with the terms and conditions of said contract.

Defendant further enters a special denial to every allegation not ad-. mitted. Defendant further by way of counterclaim, in his answer to the complaint, sets up the value of certain services, the aggregate of which are claimed to be worth $100, and concludes his answer with a prayer for judgment that the action be dismissed and that he have judgment for the amount of his alleged counterclaim and costs.

We will state the facts first, which appear to be undisputed, and, second, state the facts which appear to be in dispute, so that it may be more convenient to examine the record and consider the testimony with regard to those facts which appear to be somewhat in dispute. The facts which we think are admitted are as follows:

### Admitted Facts.

That on the 13th day of September, 1913, at Ellendale, N. D., the defendant signed the following agreement and delivered the same to plaintiffs:

### Well Contract.

This agreement, made and entered into this 13th day of September, 1913, by and between Kupfer Bros., of Ashley, N. D., party of the first part, and James McConville of Forbes, N. D., party of the second part.

Witnesseth, For and in consideration of the payment of the sum of $700, to be paid the said party of the first part by said second party in the manner hereinafter set forth, the said party of the first part hereby agrees to obtain for said party of the second part a *reasonably clear pump or flow if it will of 2 inches in diameter,* to be piped with standard pipe and surface pipes of . . . . . . . . . . . . such well to be sunk on the following premises, to wit: sec. 4–129–R. 65.

Said first party agrees to begin the sinking of said well before 15 Sept. . . . . . . and complete the same as soon thereafter as reasonably possible drilling day and night until completed. Said first party agrees at his own expense to furnish all machinery, labor, gasolene and other articles —Said second party agrees to transport the machinery and materials

35 N. D.—40.

from Morriscourt—to place of sinking said well and furnish all water for use in said work, and board the men while said work is in progress, and during all of the time of sinking said well the second party agrees to pay said first party the sum of seven hundred . . . . in cash, and agrees to pay the balance thereof as follows: . . .

*Said party of the first part guarantees well for one year.*

The terms of this agreement shall be binding upon the heirs, executors and administrators of the said parties.

Signed in presence of

. . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . .                    James McConville.

Plaintiffs commenced to work upon said well some time after the 13th day of September, 1913. The agreed price for drilling and constructing said well was $700, to be paid by the defendant; that the defendant was the owner in fee of the northeast quarter of section 4–129–65; that said well was guaranteed for one year; that the said well sunk upon defendant's said land by the said plaintiffs was only to the depth of 1,315 feet.

There remains in dispute four questions of fact: 1. Relating to the character of the contract as to whether the whole contract was in writing and consisted wholly of exhibit A, or whether the contract was partly in writing and partly verbal. 2. What, if any, depth was agreed upon as to which said well would be dug, drilled, or constructed. 3. What was the character of the well as to whether it should be a flow well or a pump well. 4. What, if any, was the agreement with reference to the quantity and quality of water such well was to produce.

Referring to the first question in regard to the first disputed fact as to whether all the contract was contained in exhibit A or as to whether that contract was added to, or modified at the time or subsequent to the date of its execution, those are matters which the testimony of the witnesses, in view of all the circumstances of the case and the character of exhibit A, must determine. A very casual inspection of exhibit A will disclose that it is a very ambiguous and meaningless instrument. A great deal of the subject-matter which would appear to be necessary in such contract appears, from a mere inspection of exhibit A, to have been wholly omitted. We may assume that exhibit A intended to set

forth the conditions in regard to the building and construction of a well, but uncertainty marks almost every portion of exhibit A.

Of the main elements necessary in said contract, only three seem to have been set forth reasonably clear in exhibit A; namely, the parties to the contract, the price to be received for the construction of said well, and that the well was to be guaranteed for a year. Further than this most all of the necessary elements necessary to determine the intention of the parties are missing. Exhibit A standing alone and without testimony to explain it does not show to what depth the well was to be dug, nor what standard was taken, if any, as to which the depth of the well should correspond, or whether or not the well should be a pump well or a flow well, or under what conditions the defendant would be required to accept the pump well or on what conditions were plaintiffs required to furnish a flow well. These elements, mostly all, if not all, were necessary to be present in this contract if it should be an intelligible, understandable, and enforceable contract in equity. The plaintiffs deny in their testimony any other contract or agreement except that set forth in exhibit A. The defendant, on the other hand, testifies that exhibit A does not contain all the terms of the contract with reference to the well, but, at the time of signing the same and thereafter, he fully stated all the terms of such contract to the plaintiffs, as is shown by his testimony on pages 57, 58, and 69 of the transcript, the same testimony thereon is pertinent to each disputed facts numbered 1 and 2. Defendant claims the terms of the contract which he really made with the plaintiffs for the construction of said well were the same as the terms of a proposed well contract between him and one Valentine, another well-digger; the terms of the proposed contract with Valentine for the construction for defendant of a well, the defendant claimed, are the same and were taken as the standard for the construction of the well for which he contracted from plaintiffs.

The testimony of defendant as to the terms of his proposed contract with Valentine is as follows:

Q. What kind of a well did you agree to get from Valentine?

A. He agreed to put me down a 2-inch well; that is the kind I wanted on the place.

By the Court: State exactly what you said to these gentlemen in this conversation; don't tell me, for instance, that you told them just ex-

actly what Valentine agreed to do; as near as you can, state just what you said to them and just what they said to you?

A. I told them I was wanting a well down as deep as Valentine agreed to put it down for me, and that would be average around, around, that my land was at least 50 feet higher than McGannon's, and that I wanted a well down that deep, that deep on my farm, and they asked me what price he was charging me, and I said $550, he told me $550, and they said they couldn't put down a well at that price; that they would have to—they wouldn't put it down any less than $750; I said I wouldn't give that price, that I would go back and see Valentine before I would do that; so they come down $50; they said they would put it down for $700 and I said I wouldn't give it, and so finally that evening, that was Sunday, I thought it over and the renter on the place was kicking about water—he had to haul water, there wasn't enough in the well I had there to supply them, and I come to town and I told them that I would bargain to put down a well according to the agreement that I had made with Valentine, to the depth of McGannon's well and 50 feet deeper on a level with the artesian basin; that I was willing to take it whether it flowed or I had to pump it; I didn't care if they had dug it down that deep.

Q. Now had you been informed how much higher you were than McGannon's place?

A. I was informed.

Q. Who told you?

A. Valentine that spring when he came up to take the job.

Q. State whether or not you had had an instrument that showed the altitude?

A. Yes, I rode around with him, around the country for 3 or 4 miles; he told me the difference; he also showed me what it was, and said I would have to go down to that depth to get.

Q. By the Court: Who told you this?

A. Valentine.

Q. You stated to the plaintiffs just what Valentine had said?

A. I did state that yes, what that agreement was.

Q. By the Court: When you told them that—what your agreement was with Valentine, and that the well you wanted was to be as deep as McGannon's and 50 feet more, what did they say to that?

A. They said that they would go down and get me water and give me satisfaction, and that they gave satisfaction every place they went.

Q. What did you say to that?

A. Well, I said that was all I wanted, when they went down to that depth I was willing to take the well whether it flowed or pumped. (See pages 57 and 58 of the transcript.)

Q. I show you contracts exhibits "A" and "B;" do you remember signing something like that in Walker's office?

A. Yes.

Q. That is your signature to exhibit "A?"

A. Yes.

Q. And this is your signature?

A. Yes.

Q. State whether or not you read that over carefully before you signed it?

A. I did not. I couldn't see what was going into that contract; I told them I was not going on that contract altogether I wanted the depth of the well as deep as McGannon's well and I said 50 feet deeper, and I was willing to take whatever I got. (See transcript page 68.)

Q. What did you say to him at the time you signed it?

A. Well, I told him I wasn't going on that contract altogether, for I wanted a well dug the depth of McGannon's well, and I called for that all the time, and he said he would go down and get water if it was there, and give satisfaction; that was what I was looking for.

Q. By the Court: When was it you said that?

A. I said that after them papers was signed.

Q. By the Court: Did you say it before the papers were signed?

A. Yes I did; I did say it all the time.

Referring now to disputed fact number 2, pertaining to the depth that J. C. McConville's well was to be, the testimony of McGannon regarding the depth of his well (McGannon's well which well defendant claims was to be the standard of depth of his (defendant's) well, except defendant's well was to be 50 feet deeper) is as follows:

Q. Are you acquainted with Kupfer Brothers, the plaintiffs?

A. Yes.

Q. If you know, state whether they were at your house about the time they commenced work?

A. They were.

Q. Do you know whether or not they had yet been to McConville's place?

A. I don't know only what I had heard—I didn't see them there.

Q. Did you see them when they were at your place?

A. Yes.

Q. Did you have a talk with them?

A. Yes.

Q. Tell the court what that talk was?

A. Harlan came in an automobile with another man with him by the name of John Hoffman, and they stopped in my yard, and I came forward and they asked me how deep my well was, and I says that well is somewhere over 1,400 feet I believe. He says, isn't it a fact that that well is pretty deep, I says it is—it seems that way; then the three of us walked to where the tank, where the water was flowing into the tank, and he says this water is, seems to be a weak flow, and I explained to him that it was piped—that it wasn't all going to one place, and so that was all the conversation we had at that time.

Q. Now, state whether or not you heard McConville ask the plaintiffs at any time at his place as to how deep the well was?

A. I did.

A. I did one day at the noon meal, he asked them that and they said they didn't know. (See pages 83 and 84 of the transcript.)

The plaintiffs' testimony was to the effect that the only contract made in regard to the digging of said well was that set forth in exhibits "A" and "B," and they deny the conversation and statement of defendant with regard to the depth of which they were to go, that is 50 feet deeper than McGannon's well.

Referring to the disputed facts numbered 3 and 4, they may be grouped in one analysis and the testimony considered with reference to both at the same time.

John Kupfer, one of the plaintiffs, testified as follows:

Q. How many feet deep was the well?

A. Well, it figured up to be about 1,370 feet.

Q. After putting in these finishing pipes, then what did you do?

A. Well then we rigged it up for to pump it.

Q. And did you put a pump on?

A. No, we put a cylinder in and our rods and went to pumping with the machine.

Q. Went to pumping?

A. Yes.

Q. How long did you pump?

A. Well, we got to pumping Sunday and we pumped until Tuesday at two o'clock.

Q. And what kind of water was coming from there?

A. Why, a while before we quit it was nice and clear, and pumped a nice stroke, we satisfied ourselves on that.

Q. About how much water did you pump an hour?

A. Why, I couldn't say just how much we pumped—we didn't measure how much we pumped; we just knowed the pump pulled a stroke and pulled it steady right along.

Q. Did you see McConville about that time?

A. Yes I saw him.

Q. Did you talk to him about this pumping?

A. Well, I didn't have much to say to him about the pumping. (See pages 6 and 7 of the transcript.)

Harland Kupfer testifies as follows:

Q. Do you know who was working on that well besides yourself while you were there?

A. Yes, there was Bradford and my brother and John Hoffman.

Q. Were you there when they struck this water vein, rock, which is usually called the artesian basis?

A. Well I was there—not when they struck it.

Q. Where was the drill with reference to the artesian basin at the time you came on?

A. They had just gone through the basin.

Q. How long did they drill after they got through the basin?

A. I should judge probably an hour and a half.

Q. Then what did you do?

A. We quit drilling.

Q. Tell the court everything that was done?

A. We went through the basin and of course when you get through the basin you get hard—get what is called the solid sandstone, and the bit won't go—it is practically sandstone and it just merely eats the bit up, and sometimes you will get down a little, 3 or 4 inches, and maybe again you will be practically four or five hours.

Q. Tell the court what you done, successively, until you got through?

A. Then we quit and started to finish up—take up the drill line and put in the casing, the two inch pipe.

Q. Keep on, tell what you did until you got through?

A. We put the 2-inch pipe down—after we got the tool out—we put the 2-inch pipe down and then put down the cylinder, Eureka cylinder, 2-inch cylinder, I think it was a 10-inch stroke, Eureka cylinder, most of them are supposed to be 12-inch stroke, and we started pumping.

Q. How long did you pump?

A. We kept pumping of course—at first the water wasn't clear, but we kept on pumping until the water was nice and clear and pumped a full stroke, about forty-eight strokes to the minute, a 10-inch stroke.

Q. Was there plenty of water?

A. There was plenty of water there so we pumped out a large pond there that covered a spot nearly as large as this building with the water we had pumped out of the well. Of course after I got the pump going a little and felt that the well was perfectly allright I goes in to McConville, and told him we had a good well out there, and if he wanted me to, I would take his engine, which hadn't been used for probably several years, and I would fix it up in running condition and put the pump on and furnish the gasolene, and pump the well until he was thoroughly satisfied that the well was all right.

Q. What did he say?

A. Well, he said he didn't want no pump and he was going to have a flowing well if it cost him several thousand dollars.

Q. What did you say?

A. I told him I could probably get a flow if I went down to the artesian water, and he wanted to know how much we wanted a foot to go on, and I told him $2 a foot. (See pages 33 et seq., transcript.)

At the bottom of page 60 and the top of page 61, regarding the quantity of water said well would furnish, the defendant testified:

"And that night they put in a cylinder pump, as they call a cylinder, a double cylinder, and they went to work pumping and they worked all night I suppose with the pump—I don't know, I went to bed, but the next morning they were pumping—still jabbing with the rods, splashing up and down with the rods, and there was a little water over the edge of the pipes—enough, not enough to wet the pipe, and they come in and called—he called this Cal, the biggest fellow, Harlan and he got up and he went to the telephone, etc."

There is a great deal of other testimony in the case of different witnesses, all of which has been more or less carefully considered, regarding the different matters which came up for discussion during the trial of said case, such as the fact that there were several artesian wells in that vicinity which were flowing and several artesian wells in that same vicinity which were not flowing, giving the names of the respective parties.

We have quoted from the testimony at some length, and read with considerable care the transcript referring to the important elements of this case.

The trial court heard all the testimony in this case, and all questions of fact were submitted to him. He saw each of these witnesses on the stand, had an opportunity to observe their demeanor, and was in a more advantageous position to determine the credit to be given to the testimony of the respective witnesses than we. There is severe conflict in some of the testimony, but considering the vagueness and uncertainty of the contracts marked exhibits A and B, the ambiguity of the same, and in a large sense its meaningless phrases, and considering further that the object of this arrangement between the plaintiffs and defendant must have been for the purpose of obtaining for defendant a well, either an artesian flow well or, if that could not be obtained, a pump well which would supply water for defendant's use upon his farm.

We feel justified in agreeing with the trial court in regard to the facts in this case, and we do agree with the findings of fact of the trial court. There yet remains but the questions of law, which we now proceed to discuss. The plaintiffs in this case have relied wholly and entirely upon exhibits A and B, both exhibits being the same instrument, to recover in this case. Exhibits A and B are the so-called "well contract." By the mere inspection of the said well contract hereafter re-

ferred to as exhibit A, it will be seen that it is without any question an ambiguous, uncertain, and almost meaningless instrument. The plaintiffs, however, rely wholly and entirely so far as they are concerned, upon exhibit A to obtain the relief demanded by their complaint. The plaintiffs themselves in their brief in this action, filed with this court on page 15 thereof, referring to exhibit A as follows: "It is evident that it is inartistically and negligently drawn and by one who was not used to drawing contracts, but, in view of the surrounding circumstances and the situation of the parties and the matters to which it relates and its purposes and object, the question to be determined is whether, from the writing itself and viewed in the light of the circumstances under which it was made, the real intention of the parties can be determined from it. In other words, does the instrument, taken in its entirety, giving effect to all its parts, import a binding agreement? The parties and the consideration to be paid by the defendant are set forth with sufficient certainty, and there is no controversy in relation to those matters. The uncertainty arises out of the language used as to the *principal object of the contract,* but it clearly appears from the circumstances under which the writing was made and the matters to which it relates, including all the negotiations between them, and that it related to the digging of an artesian well." It is thus seen, even from the standpoint of the plaintiffs relying as they do entirely upon exhibit A as being the whole contract between plaintiffs and defendant, that they must also refer to the circumstances and the matters to which it relates and the negotiations between the parties in order to give any real and definite meaning to exhibit A, that is, standing alone, unexplained and unassisted by proof of facts outside of the contract. Exhibit A really has no plain meaning, and is and must be admitted to be exceedingly uncertain. Its uncertainty as to the depth of the well, its uncertainty as to the quality and quantity of water, must be admitted.

Referring now to the defendant's version concerning the making of this contract, and while it is the general rule that oral testimony is not admissible to vary the terms of a written instrument, the case under consideration is not such a case. There is no attempt to vary any of the terms of the contract which are set forth in exhibit A. There is no attempt to introduce oral testimony to vary the price or the time of pay-

ment, nor show that there were any other parties to the contract. The parol or extrinsic testimony was introduced for the purpose of proving what were the terms of the contract which were omitted from it, and which when omitted from said contract exhibit A would leave exhibit A ambiguous and meaningless.

The testimony of defendant shows that he claims he made certain conditions as to the depth and kind of a well that he should have at the time exhibit A was signed, and also before and after it was signed, made the same conditions to plaintiff, and under all the circumstances in the case and by reason of the ambiguity and uncertainty of exhibit A, we think the trial court did not err in admitting parol and extrinsic testimony to show what was the agreement as to the material element of such contract agreed upon between the parties at the time the contract was made or thereafter, but which were not inserted in the contract. Assuming, then, that the testimony of all the witnesses who testified to what the contract really was should be taken together in connection with exhibit A, and then assumed to be the contract between the plaintiffs and defendant. Then the question arises, Can recovery be had upon this contract even after the terms of the whole contract have been made more certain and definite by parol and extrinsic testimony? We think not, for the reason that the plaintiffs have wholly and entirely failed to show a compliance with the contract, either in the form of exhibit A alone or even as modified by the testimony of the defendant and McGannon or any other person testifying in his behalf.

"If a party by his contract charge himself with an obligation possible to be performed he must make it good unless its performance is rendered impossible by the act of God, the law, or the other party. Unforeseen difficulties, however great, will not excuse him." 3 Sutherland, Damages, § 686.

"Plaintiff must show performance of conditions precedent before he can recover on the contract." See 9 Cyc. 761 et seq.

"A party who sues on a special contract to recover compensation alleged to be due on its performance must show performance." 9 Cyc. 757, 759.

The trial court in its findings of fact found that the plaintiffs agreed to sinking a well for the defendant 50 feet deeper than the well belonging to said McGannon, and that if a flow well could not be obtained by

going to the depth stated then the plaintiff should furnish to defendant a pump well that would furnish water suitable for stock and domestic purposes and in reasonable quantities, and that McGannon's well was 1,400 feet, and that the well dug by defendant was only 1,315 feet deep, that plaintiffs did not furnish the defendant a flow well, that the plaintiffs guaranteed the well for one year, that plaintiffs did not furnish defendant any kind of a well that furnished suitable water for stock and domestic purposes for one year; that plaintiffs therefore did not comply with the terms and conditions of their agreement.

Adopting the findings of fact of the trial court, which we do, there was then an entire failure on the part of the plaintiffs to perform the conditions precedent which they were under obligations to perform before they could recover for the agreed price of such well, and most especially before they could come into a court of equity and ask for the foreclosure of a mechanic's lien which was filed to secure said alleged mechanic's lien. It would appear that the plaintiffs have wholly failed to make proof of the performance of the precedent conditions, and therefore must be denied any relief in this case. The plaintiffs made application for an order to show cause in the supreme court in this case, which came on to be heard herein, why said case should not be returned to the district court for the purpose of taking more testimony therein with regard to certain matters, which is denied. For the reasons hereinbefore set forth the plaintiffs can have no recovery in this action. We do not say they are entirely remediless, but most assuredly their remedy, if it lie at all, is not in a proceeding in equity.

The application for order to show cause is therefore denied. The judgment appealed from is in all things affirmed, with costs.

CHRISTIANSON, J. I concur in the result.