UNITED STATES of America for the Use
of the HOME INDEMNITY COMPA-
NY, a corporation, Assignee, Plaintiff,

v.

AMERICAN EMPLOYERS' INSURANCE
COMPANY, a corporation, and Oil Cap-
ital Construction Company, a corpora-
tion, Defendants,

and

United States of America,
Interpleaded Defendant,

and

York Electric Construction Company, a
corporation, Additional Indispensa-
ble Party Defendant.

Civ. No. 3618.

United States District Court
D. North Dakota,
Northeastern Division.

April 8, 1961.

Harold D. Shaft, of Shaft, Benson & Shaft, Grand Forks, N. D., and John Murphy, of Tucker, Murphy, Wilson & Siddens, Kansas City, Mo., for plaintiff, Home Indemnity Co.

Robert Vaaler, of Day, Stokes, Vaaler & Gillig, Grand Forks, N. D., for defendants, American Employers' Ins. Co. and Oil Capital Const. Co.

Robert L. Handros and John M. Burzio, Tax Division, United States Department of Justice, Washington, D. C., for interpleaded defendant, United States of America.

RONALD N. DAVIES, District Judge.

Oil Capital Construction Company (hereinafter Oil Capital) was prime contractor under a contract with the United States for certain construction work on the Grand Forks, North Dakota, Air Force Base. American Employers' Insurance Company (hereinafter American Employers') issued performance and payment bonds thereon under provisions of the Miller Act, 40 U.S.C.A. §§ 270a, 270b.

On February 11, 1957, Oil Capital made a subcontract with York Electric Construction Company (hereinafter York) whereby York agreed to furnish certain materials and labor for construction of utilities required under the prime contract. A performance bond was executed and delivered on February 25, 1957, by The Home Indemnity Company (hereinafter Home Indemnity) conditioned upon the faithful performance of the subcontract by York. The performance bond among other things provided:

"Whenever Contractor (York) shall be, and declared by Owner (Oil Capital) to be in default under the Contract, the Owner having performed Owner's obligations thereunder, the Surety may promptly remedy the default, or shall promptly

"(1) Complete the Contract in accordance with its terms and conditions, or

"(2) Obtain a bid or bids for submission to Owner for completing the Contract in accordance with its terms and conditions, and upon determination by Owner and Surety of the lowest responsible bidder, arrange for a contract between such bidder and Owner and make available as work progresses (even though there should be a default or a succession of defaults under the contract or contracts of completion arranged under this paragraph) sufficient funds to pay the cost of completion less the balance of the contract price, but not exceeding, including other costs and damages for which the Surety may be liable hereunder, the amount set forth in the first paragraph hereof. The term 'balance of the contract price', as used in this paragraph, shall mean the total amount payable by Owner to Contractor under the Contract and any amendments thereto, less the amount properly paid by Owner to Contractor."

Prior to commencing work under the subcontract, York notified both Home Indemnity and Oil Capital that due to financial difficulties it would not be able to perform the subcontract. Oil Capital immediately called upon Home Indemnity as surety to make good the default of its principal, York. Under terms of the performance bond Home Indemnity was confronted with a choice either of completing or reletting the subcontract. Oil Capital expressed a desire that York be

allowed to undertake performance if at all possible. York was in default on several other contracts upon which Home Indemnity was acting as surety, and therefore Home Indemnity anticipated substantial suretyship losses. Desirous of keeping its anticipated losses to a minimum, Home Indemnity allowed York to proceed under certain conditions.

York executed an assignment of the subcontract price to Home Indemnity; a joint control account was set up in which deposit was to be made of the subcontract funds; and Oil Capital was authorized to pay certain of York's suppliers directly. Other material suppliers were to be paid from the joint control account after Home Indemnity's approval. Material costs in excess of the deposits in the control account were to be paid from funds advanced by Home Indemnity. Payroll expenses were supplied to York by Home Indemnity upon submission of payroll vouchers. Net payroll costs only were advanced, no provision being made for the payment of withholding taxes.

After making this agreement on April 12, 1957, York was allowed to proceed with the work commencing the week of April 25, 1957, and so far as York was concerned, finishing the week of September 25, 1957. Certain odds and ends called the "punch list" remained, and Home Indemnity employed Jayhawk Electric Construction Company (Jayhawk) to complete the subcontract. This was done by November 28, 1957, but as a dispute arose over the amount due Jayhawk, they were not paid by Home Indemnity until April 7, 1958.

A total of $22,852.47 was deposited in the joint control account from payments made by Oil Capital on the subcontract. Of this amount $19,791.38 was paid out for material expenses, and the balance of $3,061.09 was withdrawn by Home Indemnity for its own use. In addition to amounts paid out of the joint control account, Home Indemnity made necessary labor and material payments and thereby suffered a suretyship loss of $21,794.81.

The United States Government made assessments for payroll withholding taxes against York on May 31, 1957, November 15, 1957, and March 7, 1958, respectively, filing notices of tax liens on January 3 and on June 4, 1958. Notice of levy and demand were served on Oil Capital for the unpaid taxes.

Upon completion of the subcontract there remained due and owing an unpaid portion of the subcontract price which Oil Capital refused to deliver. Home Indemnity, use plaintiff here, as York's assignee, pursuant to Sections 270a and 270b of the Miller Act, supra, brought this action against Oil Capital and its surety, American Employers'. The defendants answered jointly, admitting liability but pleading the Federal tax liens as an affirmative defense. A motion to interplead the United States was granted, whereupon the Government answered, asserting the tax liens and crossclaiming against the use plaintiff, Home Indemnity, for the sum of $2,345.25 plus interest for payroll taxes not paid by York on the Grand Forks Air Force Base project. The tax liens asserted include York's tax liabilities incurred on the Grand Forks job, but the Government contends that Home Indemnity is liable on its bond for this sum *independently* of the tax liens.

The Government moved to add York as an indispensable party defendant which motion was granted. York did not appear or answer, and judgment for $11,175.71, the full amount of the taxes plus interest, will be entered against York in favor of the United States of America.

On trial it was stipulated that the total tax liability of York was $11,175.71 plus interest, and the sum left due and owing under the subcontract was $12,000. Oil Capital and its surety, American Employers', admitting liability, have paid into this court the $12,000 now in dispute.

The Government bases its claim to the fund here in issue upon 26 U.S.C.A. § 6321, which reads so far as is here relevant:

"If any person liable to pay any tax neglects or refuses to pay the

same after demand, the amount * * shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."

The section following provides that a lien for taxes "shall arise at the time assessment is made." 26 U.S.C.A. § 6322.

Section 6321 creates no property rights but merely attaches consequences, Federally defined, to rights created under state law, United States v. Bess, 357 U.S. 51, 78 S.Ct. 1054, 2 L.Ed. 2d 1135; and the right to recover from the fund must be based upon the strength of a claimant's title and not on the weakness of the title of another claimant, United States v. Chapman, 10 Cir., 281 F.2d 862.

The Government contends that York completed the subcontract, merely obtaining financial aid from its surety, Home Indemnity. To better understand the Government's argument, the following is quoted from the Government's brief, pp. 8, 9:

"Counsel for Home Indemnity, in their brief, cite numerous cases to show that, if a taxpayer-contractor defaults on performance of his contract, according to applicable state law there is no sum due him under the contract, to which federal tax liens can attach. All of this is, in general, good and settled law, with which the Government has no dispute. However, this law has nothing whatever to do with the case at bar. Rights to the fund in issue in the instant case do not arise under a contract governed by state law. They arise under a bond issued pursuant to the Miller Act, and rights under such a bond are governed by federal law, i. e., Sections 1 and 2 of the Act. Leibman v. United States for Use and Benefit of Cal. Elec. Supply Co., 153 F.2d 350 (C.A.9th); Continental Casualty Co. v. Schaefer, 173 F.2d 5 (C.A.9th), certiorari denied, 337 U.S. 940 [69 S.Ct. 1517, 93 L.Ed. 1745], rehearing denied 338 U.S.

[840] 841 [70 S.Ct. 35, 94 L.Ed. 514]."

The Government then argues that only York as supplier of labor or materials could recover from American Employers' under the Miller Act.

With this contention this Court does not agree, but finds that, in effect, York was a mere agent of Home Indemnity and was the vehicle utilized by the surety in completing the subcontract as required by the performance bond. Central Surety & Insurance Corp. v. Martin Infante Co., 3 Cir., 272 F.2d 231.

It is true that original jurisdiction in this action was predicated on the Miller Act which gives the use plaintiff the right to proceed directly against the prime contractor's surety. The use plaintiff's theory in the original complaint was that the subcontract had been performed by York and, as York's assignee, the action could be instituted directly against both Oil Capital as principal, and American Employers' as surety, on the payment bond.

The complexion of the case changed, however, after the original defendants answered jointly, admitted liability, interpleaded the Government and paid into the Court's registry account the disputed sum of $12,000. An amended complaint was filed by Home Indemnity wherein its rights to the fund were based upon two theories, the first as assignee of York Electric, and the second on its rights as completing surety (subrogation). It is on the second theory that Home Indemnity must prevail if at all. United States v. Bess, supra; United States v. Acri, 348 U.S. 211, 75 S.Ct. 239, 99 L.Ed. 264; United States v. City of New Britain, 347 U.S. 81, 74 S.Ct. 367, 98 L.Ed. 520; United States v. White Bear Brewing Company, 350 U.S. 1010, 76 S.Ct. 646, 100 L.Ed. 871; United States v. R. F. Ball Construction Company, 355 U.S. 587, 78 S.Ct. 442, 2 L.Ed. 2d 510; cases wherein it was held that under Federal law for a lien to be valid it must be choate, and in the case of a surety's lien growing out of assignment it was inchoate, and therefore not on the same footing as the Federal tax liens.

The first issue to be determined here is set out in Aquilino v. United States, 363 U.S. 509, 512, 80 S.Ct. 1277, 1280, 4 L.Ed.2d 1365:

"The threshold question in this case, as in all cases where the Federal Government asserts its tax lien, is whether and to what extent the taxpayer had 'property' or 'rights to property' to which the tax lien could attach. In answering that question, both federal and state courts must look to state law, for it has long been the rule that 'in the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property * * sought to be reached by the statute.' Morgan v. Commissioner [of Internal Revenue], 309 U.S. 78, 82 [626, 60 S.Ct. 424, 426, 84 L.Ed. 585]. * * *. However, once the tax lien has attached to the taxpayer's state-created interests, we enter the province of federal law, which we have consistently held determines the priority of competing liens asserted against the taxpayer's 'property' or 'rights to property.' "

█ The Home Indemnity rights arising by subrogation relate back to the date of the execution of the performance bond. Prairie State Nat. Bank of Chicago v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412; Henningsen v. United States Fidelity & Guaranty Company, 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547; United States Fidelity & Guaranty Company v. Sweeney, 8 Cir., 80 F.2d 235;. Gilbertson v. Northern Trust Company, 53 N.D. 502, 503, 207 N.W. 42, 42 A.L.R. 1353; and it is entitled to the benefit of every security for the performance of the principal obligation held by the creditor at the time of entering into the contract of suretyship. North Dakota Century Code, Section 22–03–12.

██ Under North Dakota law, York Electric had no "property" or "rights to property" in the subcontract price to which Federal tax liens could attach. North Dakota follows the general rule

that a material failure of performance by one party to a contract, not justified by the conduct of the other, discharges the latter's duty to give the agreed exchange. North Dakota Century Code, Section 9–01–16; Kupfer v. McConville, 35 N.D. 622, 161 N.W. 283. Since the Government's rights can rise no higher than those of York Electric, there was nothing to which the liens could attach. Central Surety & Insurance Corp. v. Martin Infante Co., supra; Atlantic Refining Co. v. Continental Casualty Co., D.C., 183 F.Supp. 478. It appears to this Court that United States v. R. F. Ball Construction Company, supra, would control here, as the Government contends, *only* if Home Indemnity was basing its action as York's assignee. As this Court understands it, the rationale of Ball suggests that an assignment made by a subcontractor to his performance-bond surety of all sums to become due for performance of the subcontract, as security for any indebtedness or liability thereafter incurred by the subcontractor to the surety, did not constitute the surety a mortgagee of those sums within the meaning of the Internal Revenue Code of 1939, § 3672(a), as amended, 26 U.S.C.A. § 3672(a).

It does appear, however, that since Aquilino, supra, and United States v. Durham Lumber Company, 363 U.S. 522, 80 S.Ct. 1282, 4 L.Ed.2d 1371, the so-called "choateness" rule of Ball has been restricted and the priorities will be established by state law. This is high-lighted by the dissenting opinion of Mr. Justice Harlan in Aquilino, supra, 363 U.S. at page 521, 80 S.Ct. at page 1288, wherein he says:

"* * * If the federal standard of choateness is thought to be an undesirable restriction on the States' freedom to regulate property relationships, the cases establishing that standard should be expressly overruled and not emasculated by dubious distinctions."

It is evident then that Home Indemnity's subrogation rights take priority over the tax liens of the United States.

In Massachusetts Bonding & Ins. Co. v. State of New York, 259 F.2d 33, 37, 38, the Court said:

"The questions here are whether the bankrupt defaulted so as to bring into operation the rights of the surety, and if so, whether these rights to payments from the owner take priority over tax claims of the State of New York and the United States. Both the State and the United States vehemently argue that the default contemplated in the contract between the bankrupt and the surety never occurred, and hence the assignment never matured; nor did the surety acquire a lien by way of subrogation. To some extent the arrangement created by the bankrupt and the surety whereby construction costs were paid out of the joint account into which they deposited progress payments supports this argument, for nominally the bankrupt continued its operations subject only to financial supervision by the surety. In this way construction activity never ceased and bills were paid without material delay. But to analyze these facts so as to deprive the surety of its claim based on subrogation when it actually provided over $136,000 of its own money to pay laborers and materialmen is too technical to warrant serious consideration. * * *"

It is felt that the foregoing quotation aptly describes the situation in the case at bar.

■ The Government is entitled to judgment on its cross-claim against Home Indemnity for withholding taxes not paid but incurred in performance of the subcontract.

■ Where a surety issues a performance bond conditioned upon the faithful performance of a contract in which there is no requirement that all taxes be paid, the Government cannot recover on the bond for unpaid taxes incurred by a defaulting principal. United States v. Crosland Construction Company, 4 Cir., 217 F.2d 275; Westover v. William Simpson Construction Co., 9 Cir., 209 F.2d 908; General Casualty Co. of America v. United States, 5 Cir., 205 F.2d 753; United States Fidelity & Guaranty Co. v. United States, 10 Cir., 201 F.2d 118; First National Bank in Yonkers v. City of New York, D.C., 177 F.Supp. 175. An exception occurs, however, where the surety guarantees the faithful performance of all covenants and agreements in the contract, and these include an agreement to pay all the taxes payable because of the work. United States v. Phoenix Indemnity Company, 4 Cir., 231 F.2d 573.

The contract upon which Home Indemnity issued its performance bond provided that:

"The Subcontractor (York) shall pay all taxes of whatever kind imposed by any governmental authority in connection with his work, including but not limited to sales taxes, unemployment compensation and social security taxes. * * *"

But here the performance bond specifically provides that:

"No right of action shall accrue on this bond to or for the use of any person or corporation other than the Owner herein or the heirs, executors, administrators or successors of Owner."

■ And the Government cannot recover as a third-party beneficiary as it did in the Phoenix case. United States v. Island Constructors, Inc., D.C., 179 F. Supp. 133.

This Court would be inclined to follow the view taken in Island Constructors, supra, if it were not for the fact that York was merely the means utilized by Home Indemnity in completing the subcontract. By this the Court means only that where the taxes are incurred under the facts here present is the surety to be held liable.

The Court finds that the interpleaded defendant, United States of America, is entitled to judgment against The Home Indemnity Company upon the Government's cross-claim in the sum of $2,345.25 plus interest, that being the amount of

the unpaid taxes arising out of the completion of the subcontract on the Grand Forks Air Base.

The Court further concludes that Home Indemnity Company is entitled to judgment in the sum of $12,000 against American Employers' Insurance Company and Oil Capital Construction Company.

So far as the use plaintiff, The Home Indemnity Company, and the interpleaded defendant, the United States of America, are concerned, the ultimate result is that of the $12,000 in the Clerk's custody the United States is entitled to the unpaid taxes incurred in the prosecution of the work called for by the subcontract, in the sum of $2,345.25, together with interest thereon as provided by law, and The Home Indemnity Company is entitled to the balance remaining.

No costs will be allowed or assessed against any party to this litigation.

The attorneys for the use plaintiff, The Home Indemnity Company, a corporation, will prepare appropriate findings of fact, conclusions of law, order for judgment and judgment, in conformance herewith and transmit them through the Clerk of this court.

It is so ordered.