MONARCH PHOTO, INC., Plaintiff,

v.

QUALEX, INC., Defendant.

Civil No. A3–93–181.

United States District Court,
D. North Dakota,
Southeastern Division.

Feb. 27, 1996.

**1030**

Wickham Corwin, Fargo, ND, for Plaintiff.

C. Nicholas Vogel, Fargo, ND, for Defendant.

## MEMORANDUM AND ORDER

VAN SICKLE, District Judge.

## I. FINDINGS OF FACT

On November 4, 1991, the Defendant, Qualex, purchased the wholesale photofinishing business of the Plaintiff, Monarch Photo.[1] Ex. 1. The majority of the purchase price was for the obtaining of customer lists and contracts between Monarch and its wholesale customers. *Id.*, 4. The parties also signed an "Ancillary Services Agreement" which was to take effect on January 2, 1992.[2] Ex. 3. In essence, the Ancillary Agreement sought to provide Monarch with a five-year income stream as it refocused the concentration of its business from wholesale photo processing to catering to the needs of the professional and serious amateur photographer. Monarch would have the opportunity to process the work it had been doing before the company was purchased and Qualex would gain by augmenting its client base

1. Qualex is a national film processing company wholly owned by Kodak while Monarch is a local film processing entity which services primarily the Dakotas and Minnesota.

2. The relevant portion of the Ancillary agreement is as follows:

"... the parties hereto agree as follows:

1. *Performance of Ancillary Services.* During the term of this Agreement, Seller [Monarch] will perform the Buyer's [Qualex's] requirements which are received at Buyer's Fargo Facility from customers listed on the Customer Lists (as defined in the Purchase Agreement) for the following photofinishing services which are not currently performed by Buyer at Buyer's Fargo Facility (the "Ancillary Services"), in accordance with this Agreement:

a. Black and white film processing, printing, and enlargements;

b. Color negative enlargements, copying of negatives, and combination printing packages;

c. Creation, from slides, of color prints and enlargements;

d. Ektachrome slide processing and mounting;

e. Creation of duplicate slides;

f. Videotape transfer and duplication; and

g. Certain other miscellaneous items to be agreed on from time to time between the parties. In addition, the Buyer may, in its sole discretion, refer similar work, which shall also constitute Ancillary Services, received at Buyer's Fargo Facility from customers other than customers listed on the Customer lists.

2. *Payment.* The Buyer shall pay the Seller the prices indicated on Buyer's intercompany price schedule in effect from time to time (the "Price Schedule") for the Ancillary Services.

3. *Rejection.* If the seller is unable to perform a given order for Ancillary Services, it may reject that order but only if notice is given to Buyer of such rejection within four hours of the receipt by Seller of the order. Except as provided in Section 5, rejection by Seller of any order shall not constitute grounds for termination of this Agreement.

4. *Term.* Unless sooner terminated pursuant to Section 5 or 6, the term of this Agreement shall be five years from the date hereof.

5. *Termination by the Buyer.* The Buyer may terminate this agreement immediately upon written notice to the Seller in the event that, in the reasonable judgment of the Buyer, either the quality of or the service time for the Ancillary Services performed by the Seller is unsatisfactory, or the percentage of orders rejected by the Seller is unsatisfactory. The parties anticipate the service time required by Buyer for any given order will generally be between two and three days for each type of Ancillary Service to be performed on that order.

6. *Termination by the Seller.* Seller may terminate this Agreement at any time upon ninety days' written notice to the Buyer.

7. *Option of Buyer.* If from time to time the orders for Ancillary Services received from customers on the Customer Lists are of a volume or variety such that, in the reasonable judgment of the Buyer, the Seller would not be able to satisfactorily perform them, the Buyer shall have the option, without terminating the Agreement, to have a certain portion of such orders performed by parties other than the Buyer, while continuing to send the remainder to the Seller. If Buyer exercises this option, it shall notify the Seller that it intends generally to refer certain orders to third parties (but shall not be required to notify Seller of each such order)." Ex. 3.

with many loyal customers.[3] In a matter of months, however, the Ancillary Agreement broke down. This document is at the heart of the dispute between the two parties.

On May 20, 1992, Monarch requested a price increase on the processing of 24 and 36 exposure rolls of 35 millimeter Ektachrome slide film.[4] There was to be a 60 percent increase in net profit on the 24 exposure roll and a 66 percent increase on the 36 exposure roll for Monarch.[5] Qualex acceded to Monarch's request.[6] Monarch's request and Qualex's consent to amend its intercompany price schedule were clearly within the contemplation of the parties.[7]

On September 3, 1992, Monarch informed Qualex that it desired price increases on a variety of Ancillary Services.[8] Again, this amounted to a request for an amendment of Qualex's price schedule referred to in section two of the Ancillary Agreement. On September 15, Paul Hirchert, the General Manager of Qualex, notified Monarch's Sales Manager, Steve Garten, that Qualex would not agree to price increases on the following items: (1) black and white prints, reprints, and enlargements from black and white negatives; (2) color copyprints; (3) direct enlarged or reduced copies; and, (4) color prints and enlargements from color slides.[9] Qualex, however, did agree to the price hikes

in professional wide roll and wide roll negative development.[10] Qualex's decision to raise some prices and keep others at previous levels was made pursuant to its authority under section two of the Ancillary Agreement.

Monarch also refused to provide both a lustre or matte finishing option on regular enlargements and a glossy choice on large, poster-size enlargements.[11] While Monarch had provided lustre finishing for regular enlargements in the past, it appears that it never had offered a lustre option on poster size enlargements.[12]

After the September 1992 requested price increase situation had been resolved, it appears that Qualex expected to continue to send some work to Monarch.[13] Qualex, however, began to curtail the sending of jobs to Monarch in the last quarter of 1992. During the early portion of 1993, Qualex stopped sending any work to Monarch. One reason for this curtailment was the purchase of enlargement equipment by Qualex that made it unprofitable for Qualex to send enlargement orders to Monarch when they could be done cheaper and quicker in-house.[14] Another reason for the phase-out of work to Monarch was a new corporate policy of Qualex to send all video transfer jobs to a corporate-approved vendor in California.[15]

3. The former Monarch customers were named by Qualex as the "Excel" customers for marketing purposes.

4. Ex. 14. This work falls under section (d) of the items listed as Ancillary Services. *See supra* note 2.

5. Ex. 15.

6. Ex. 15. While the note on Exhibit 15 states "excepted", it is clear that the writer meant "accepted".

7. *See* Ex. 3, sections 2 and 5.

8. *See* Ex. 74.

9. Ex. 22.

10. *See* Exs. 26, 27.

11. *See Defendant's Trial Memorandum,* 12.

12. *See* Ex. 53.

13. *See* Ex. 27 ("the following list of products are the items we will send to Monarch ...."). This Qualex internal memorandum was dated September 22, 1992; ex. 28 (memorandum from Qualex to former Monarch customers taking into account the increase in professional wide roll finishing due to Monarch's price increase).

14. *See* Exs. 32, 33. Enlargements are an "ancillary service" as defined in section (1)(b) in the January 2, 1992 "Ancillary Services Agreement". *See supra* note 2.

15. *See* Ex. 35. This court notes that a month and a half before this policy went into effect, Qualex requested Monarch turn down a video transfer order from another company. Hirchert, Qualex's general manager, intimated that if Monarch took the job it would be violating the no-compete clause of the original contract between Monarch and Qualex. *See* Ex. 34. On the same day Qualex announced that it was taking away the video transfer work from Monarch, it claimed that Monarch had been overcharging for video work and owed Qualex $1,900. Ex. 36. Videotape transferring is an "ancillary service"

After at least two attempts to contact Qualex, Bob Artz, the president of Monarch, formally protested the reduction in work on February 15, 1993.[16] Qualex responded on April 13, 1993, stating that Monarch had breached the Ancillary Agreement and that it considered the agreement terminated.[17]

## II. Liability

### A. Applicable Law

The Plaintiff and Defendant make a variety of claims regarding the law that should apply in this matter. This Court holds that the law of divisible contracts, novation, and requirements contracts all are *not* applicable in this case.

### 1. Divisible Contract

■■■■ The Defendant is correct in its claim that this was not a divisible contract.[18] In order for there to be a divisible contract, "the performances to be exchanged under an exchange of promises can be apportioned into corresponding pairs of part performances so that the parts of each pair are properly regarded as agreed equivalents." *Restatement (Second) of Contracts* § 240. Courts have held that there is a presumption against divisibility unless it is expressly stated in the contract. *Stone Forest Indus., Inc. v. United States,* 973 F.2d 1548, 1552 (Fed.Cir.1992). In this contract, there was no discussion of apportionment as the ancillary services were portrayed as a group of services rather than things which should be viewed as distinguishable parts for the purposes of the contract. Therefore, Monarch should not be able to separate the contract into the photofinishing it refused to do after Qualex rejected the price increase and the work that Monarch continued to do after the rejection under a divisible contract theory. Monarch may succeed in this vein under a straight contract law claim. *See infra.*

### 2. Novation

■■■■ A novation did not occur as the Defendant claims. A novation can be made by the "substitution of a new obligation between the same parties with intent to release the latter." *N.D.C.C.* § 9–13–10(1). For there to be a novation, the parties must intend to extinguish the old obligation, there must be mutual assent, and there must be sufficient consideration. *Schmitt v. Berwick Twp.,* 488 N.W.2d 398, 400 (N.D.1992).

■■■■ The Defendant, Qualex, believes that "Monarch's acceptance of the substantially reduced workload with no protest or even an offer to sit down and talk over the problems" constitutes assent to the novation.[19] This Court holds, however, that mutual assent did not occur. The September, 1992 negotiations were confusing at best and nothing was reduced to writing. Moreover, Monarch cannot fall into a novation merely by failing to protest immediately a change in workload. For there to be mutual assent, there must be an objective manifestation of a meeting of the minds on all essential terms of the contract. 17A *Am.Jur.2d* Contracts § 26. Monarch's decision to allow events to take their course for a few months in the interest of preserving a working relationship with Qualex does not equal an objective manifestation of agreement to a new contract. Therefore, the law of novation does not apply to this matter.

### 3. Requirements Contract

■■■■ This is not a requirements contract as the Plaintiff claims. For there to be a requirements contract, the UCC must be applicable.[20] For the UCC to be applicable, there must be a sale of "goods" as defined in

---

as defined in the agreement under section (1)(f). *See supra* note 2.

**16.** Steve Garten, the Monarch Sales Manager, did attempt to contact Paul Hirchert, the Qualex General Manager, on January 19 and January 21, 1993, but Hirchert did not return the phone calls. Ex. 37.

**17.** Ex. 74.

**18.** *Def's Trial Mem.,* 6–7.

**19.** *Def's Trial Mem.,* 6; *Def's Post–Trial Brief,* 16.

**20.** *See N.D.C.C.* 41–02–23. A requirements contract falls within the Uniform Commercial Code chapter of the North Dakota Century Code, chapter 41–02.

the UCC.[21] The contract at bar involves both goods and services. In mixed goods and services cases, courts look to whether the goods or the services is the predominant factor, thrust, and purpose of the contract. *Air Heaters, Inc. v. Johnson Electric, Inc.,* 258 N.W.2d 649, 652 (N.D.1977). The UCC sales provisions will be applied to a sale of an ongoing business only "if the essential element or nature of the contract is for the transfer of movable goods, and the transfer of items other than movable goods, such as goodwill or realty, and the performance of other acts ... are merely incidental or secondary elements under the contract." *D.G. Porter, Inc. v. Fridley,* 373 N.W.2d 917, 924 (N.D.1985).

In the case before this Court, the central issue involves services, not goods. Equipment and inventory only accounted for $250,-000 while service-related provisions, such as customer lists and a noncompetition agreement totaled one million dollars in the original contract.[22] In addition, the Ancillary Agreement on which this dispute centers primarily involves photofinishing services rather than goods.[23] The parties also did not state in the contract that the UCC should apply. Therefore, the UCC is not applicable and the law of requirements contracts does not apply in this matter.

### B. Monarch's Breach of Contract

■ North Dakota follows the general rule "that a material failure of performance by one party to a contract, not justified by the conduct of the other, discharges the latter's duty to give the agreed exchange." *United States v. American Employers' Ins. Co.,* 192 F.Supp. 873, 877 (D.N.D.1961). *See Restatement (Second) of Contracts* § 253(2). An obligor repudiates the contract when he makes a statement indicating he will breach it or takes voluntary, affirmative action which renders him unable or apparently unable to perform the contract. *Restatement (Second) of Contracts* § 250. To determine if the breach was material, the court must look at the totality of the events and circumstances. *Stone Forest Indus., Inc. v. United States,* 973 F.2d 1548, 1552 (Fed.Cir.1992). *See Restatement (Second) of Contracts* § 241 & cmt. a.

■ This Court finds that Monarch materially breached the Ancillary Agreement given the totality of the circumstances. By refusing to perform certain types of work without a price increase, Monarch was violating the very nature of the Ancillary Agreement. Monarch did not follow the procedures outlined in the Ancillary Agreement for termination.[24] The Ancillary Agreement could not function if the Plaintiff could pick and choose which services it decided to perform on a given day depending on the profit it was receiving.

### C. Qualex's Continuation of Performance

■ It is well settled in American contract law that:

"Where there has been a material breach which does not indicate an intention to repudiate the remainder of the contract, the injured party has an election of continuing performance, or of ceasing to perform, or of repudiating the contract. Any act by the injured party indicating an intent to continue will operate as a conclusive election, not depriving him of his right of action for the breach which has already taken place, but depriving him of any excuse for ceasing performance on his own part ... a party may waive a breach by the other party and be liable for his own subsequent breach." 17A *Am.Jur.2d* Contracts § 731.

■ Under North Dakota law, a contract in writing may be altered by an executed oral agreement. *N.D.C.C.* 9–09–06. An oral agreement is executed "whenever the party performing has incurred a detriment which he was not obligated by the original contract

---

**21.** " 'Goods' means all things ... which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid ..." *N.D.C.C.* 41–02–05.

**22.** Ex. 1.

**23.** Ex. 3.

**24.** *See Ancillary Agreement,* para. 6 ("Seller may terminate this Agreement at any time upon ninety days' written notice to the Buyer.").

to incur." *Id.* Legal detriment is defined as giving up something which the promisee was entitled to do or doing something that the promisee was privileged not to do. *Mitchell v. Barnes,* 354 N.W.2d 680, 682 (N.D.1984).

■ This court holds that Qualex elected to continue performance of the Ancillary Agreement after Monarch's September 1992 breach. Qualex expected the relationship between the two companies to remain and continued to send work to Monarch's Fargo facility after the breach occurred.[25] Qualex also did not follow the termination procedures outlined within section five of the Ancillary Agreement.[26] This court also holds that Qualex suffered a legal detriment. By electing not to abandon its duties under the Ancillary Agreement and by not repudiating the contract, Qualex gave up something which it was entitled to do. Therefore, Qualex did not have the right to curtail the forwarding of work to Monarch once it had agreed to continue the Ancillary Agreement in some form after the September 1992 pricing discussions.

## III. Damages

### A. Period of Calculation

■ The Ancillary Agreement allowed three possible rationales for Qualex's termination of the agreement. Qualex could terminate the Agreement immediately upon written request if, in its reasonable judgment,:

1. the quality of Monarch's work was unsatisfactory;

2. the service time of Monarch's performance was unsatisfactory;

3. the percentage of orders rejected by the seller is unsatisfactory.[27]

There is no dispute that the quality of Monarch's work was as good, if not superior, to that of Qualex. There is, however, disagreement between the litigants over service times and the percentage of orders rejected.

This Court finds that the service time of Monarch was satisfactory. Qualex faults Monarch for the latter's failure to produce enlargements on a next-day turnaround.[28] Yet, the Ancillary Agreement plainly states that "[t]he parties anticipate the service time required by Buyer for any given order will generally be between two and three days for each type of Ancillary Service to be performed on that order." [29] The service time problem was created by Qualex due to national competition and the purchase by the company of enlarging equipment.[30] That it would be more profitable for Qualex to do its enlargements in-house is not enough for this Court to find that Qualex could have reasonably concluded that Monarch's service time was unsatisfactory.

■ Qualex's claim that Monarch's rejection rate was unsatisfactory is stronger. Qualex fulfilled the written request requirement stated in the Ancillary Agreement [31] by its letter of April 13, 1993.[32] The reason stated for the termination was Monarch's "failure to provide the agreed upon services at the agreed upon prices." [33] Evidence of the impact of Monarch's decision to refuse the categories of work to which Qualex did not agree to a price increase in September of 1992 is apparent from the fact that there was a 71 percent drop in volume from the month before Monarch turned down categories of work (September 1992) to the month after (October 1992).[34] Qualex also had problems sorting the work that Monarch would accept from the categories that Monarch refused. Qualex could have had no expectation of

---

**25.** *See supra* note 13 and accompanying text; *Monarch's [Plaintiff's] Initial Post–Trial Brief,* 10, 13–16.

**26.** *See supra* note 2.

**27.** *See supra* note 2 (section 5).

**28.** *See Defendant's Post–Trial Brief,* 10–11.

**29.** *See supra* note 2 (section 5).

**30.** *See supra* note 14 and accompanying text; *Plaintiff's Initial Post–Trial Brief,* 5–8.

**31.** *See* Ex. 3, section 5.

**32.** Ex. 74.

**33.** *Id.*

**34.** *See Defendant's Post–Trial Brief,* 10 n. 4.

these sorting problems nor of Monarch's future denial of parts of the Ancillary Agreement when it signed the document. Even assuming that Monarch was in the right with regard to enlargements, the amount of work refused by Monarch in September of 1992 was substantial.

Therefore, this Court finds that Qualex could have reasonably believed that the percentage of orders rejected by Monarch was unsatisfactory. Qualex satisfactorily performed the termination procedure outlined in section five of the Ancillary Agreement on April 13, 1993 by stating, in writing, that the agreement was terminated due to Monarch's refusal to perform a substantial portion of the work specified within the Ancillary Agreement. Therefore, this Court holds that Monarch is entitled to receive damages incurred only from October 2, 1992 to April 13, 1993.

B. Compensatory Damages

Both litigants have presented comprehensive determinations of damage calculations. This court finds that, on the whole, the Defendant's calculations to be more credible. First, Qualex uses actual figures for its calculations. While this Court is aware that these numbers may not be entirely accurate, this Court finds that Qualex's use of actual numbers by the Monthly Sales Analysis Statements is more dependable that Monarch's reliance on estimates. Second, Qualex's interpretation of the mix of orders and revenue per order appears to be more realistic than Monarch's estimations. Third, the Ancillary Agreement discusses only the transference of orders from Qualex's Fargo plant to Monarch.[35] Thus, Monarch's attempt to add damages relating to Qualex's Eagan, Minnesota plant is misguided. Fourth, Qualex concentrates on the products listed as being part of the Ancillary Agreement, while Monarch

has attempted to add too many product categories that lie outside the scope of the Agreement. Finally, this Court believes that the Defendant's accounting expert, Robert Roel, presented evidence of the credibility of Defendant's methods that was not effectively refuted by the Plaintiff. Therefore, this Court will use Qualex's figures for the lost gross revenue determination.

■ This Court, however, will employ Monarch's direct labor and material percentages. Qualex's contention that the lost gross revenue shall be reduced by approximately 75 percent results in too great a deduction. First, Monarch, and not an outside company as in Qualex, is likely to come up with a more accurate calculation of its internal profit structure. Second, general operational expenses are not to be included in determining the cost of performance.[36] It appears that Qualex may have taken some general operation expenses into account when it determined Monarch's fixed costs. Finally, this Court finds Monarch's direct cost computations to be more accurate in their preparation.[37] Therefore, the lost revenue will be reduced by Monarch's 28.3 percent figure in order to determine the net compensatory damages.[38]

To determine the gross damages, this Court first added the orders for October 1992 through March 1993 per each general category. As the period of damages ended on April 13, 1993, the Court halved the orders for April 1993 and added them into the calculation. The Court then multiplied the October 1992 through April 1993 orders per each general category by the percentage of specific orders in each subcategory that Qualex determined to be within the Ancillary Agreement. Next, the Court multiplied that order by Qualex's revenue per order determination. The result is $11,856.73 in lost

**35.** *See supra* note 2 (section 1).

**36.** Ex. 48, table 25–1; *N.D.C.C.* 32–03–09; *Leingang v. City of Mandan Weed Bd.,* 468 N.W.2d 397, 399 (N.D.1991).

**37.** Ex. 45, 25–26.

**38.** *Id.* at 27.

revenue for Monarch.[39] Finally, the Court subtracted 28.3 percent in fixed costs from $11,856.73 to figure out Monarch's net damage total of $8,501.28.[40]

Therefore, this Court finds that Monarch is entitled to $8,501.28 in compensatory damages.

## C. Prejudgment Interest

 The awarding of prejudgment interest rests in the discretion of the district court. *Cargill, Inc. v. Taylor Towing Service, Inc.,* 642 F.2d 239, 241 (8th Cir.1981). The purpose of prejudgment interest is to make sure that the damages received by the wronged party are adequate to compensate that party for its economic losses. *See Weber v. Logan County Home for the Aged,* 623 F.Supp. 711, 715 (D.N.D.1985), *aff'd,* 804 F.2d 1058 (8th Cir.1986). The North Dakota Supreme Court has held that prejudgment interest is proper in a breach of contract case. *Troutman v. Pierce, Inc.,* 402 N.W.2d 920, 924 (N.D.1987). The applicable rate in the matter before this court is six percent per annum. *N.D.C.C.* 47–14–05; *Bismarck Realty Co. v. Folden,* 354 N.W.2d 636, 641–42 (N.D.1984).

This Court finds that prejudgment interest is appropriate in the case at bar. Interest will be computed from October 2, 1992, the date Qualex elected to continue performance of the Ancillary Agreement despite Monarch's breach. Therefore, Monarch is entitled to prejudgment interest in the amount of $1877.01.[41]

## D. Attorney's Fees

 While Monarch would be entitled to attorney's fees if it had not also been at fault, that is not the case before the Court. Qualex did not breach the Ancillary Agreement, but merely elected to continue performance after Monarch's breach of the Agreement. If Monarch was to receive attorney's fees in this matter, it would be receiving an added bonus from having breached a contract. Therefore, as Monarch initially breached the Ancillary Agreement, it is not entitled to attorney's fees.

## IV. Conclusion

The Plaintiff, Monarch Photo, is entitled to compensatory damages of $8501.28 and pre-

**39.**

| General Category | Sub–Category | 10/2/92–4/13/93 General Orders | Percent of General Cat. |
|---|---|---|---|
| Slides | Ektachrome | 2260 | 60.03 |
| Slides | Duplicate | 2260 | 2.56 |
| Video Transfer | n/a | 88 | n/a |
| Other | Copy Negative | 10564 | 22.3 |

| Sub–Category | Orders w/in Damages Period | Revenue per Order | Lost Revenue |
|---|---|---|---|
| Ektachrome Slides | 1357 | $ 2.45 | $ 3324.65 |
| Duplicate Slides | 58 | $ 3.00 | $ 174.00 |
| Video Transfer | 88 | $50.00 | $ 4400.00 |
| Copy Negatives | 2356 | $ 1.68 | $ 3958.08 |
| | | | $11856.73 |

**40.** $11,856.73 \times .717 \ (100 - 28.3\%) = \$8501.28.$

**41.**

| | | |
|---|---|---|
| 10/2/92–10/93 | $ 510.08 | ($8501.28 + ($8501.28 × .06)) |
| 10/93–10/94 | $ 540.68 | ($9011.36 + ($9011.36 × .06)) |
| 10/94–10/95 | $ 573.12 | ($9552.04 + ($9552.04 × .06)) |
| 10/95–3/96 | $ 253.13 | ($10125.16 + ($10125.16 × .06 × 5/12)) |
| | $1877.01 | |

judgment interest of $1877.01. THERE-FORE IT IS ORDERED that judgment be entered in favor of the Plaintiff, Monarch Photo, in the amount of $10,378.29.

LET THE JUDGMENT BE ENTERED ACCORDINGLY.