WESTPOINT STEVENS, INC. v PANDA-ROSEMARY CORP., 1999 NCBC 11

| | |
|---|---|
| STATE OF NORTH CAROLINA<br><br>COUNTY OF GUILFORD<br><br>WESTPOINT STEVENS, INC. and THE BIBB COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>PANDA-ROSEMARY CORPORATION, and PANDA-ROSEMARY, L.P.,<br><br>Defendants. | IN THE GENERAL COURT OF JUSTICE<br><br>SUPERIOR COURT DIVISION<br><br>99 CVS 9818<br><br><br><br>**ORDER AND OPINION** |

{1} This matter is before the Court on cross motions for summary judgment. Each party to the contracts at issue contends that it is entitled to final judgment as a matter of law based upon a legal interpretation of certain clauses in the contracts, which each party asserts contain unambiguous language. For the reasons set forth below, the Court finds that partial summary judgment may be entered with respect to some of the issues. However, if the Court is correct in its interpretation of the contracts, genuine issues of material fact remain to be determined with respect to the central issue governing this dispute.

*Moss and Mason, by Joseph W. Moss and Matthew L. Mason; Sutherland Asbill & Brennan LLP, by James A. Orr, William R. Wildman and John A. Chandler, for Plaintiff WestPoint Stevens, Inc.*

*Moore & Van Allen, PLLC, by James P. McLoughlin, Jr. and Meredith W. Holler, for Plaintiff The Bibb Company.*

*Young, Moore & Henderson, PA, by John N. Fountain; Haynes & Boone, L.L.P., by Werner A. Powers and Ernest Martin, Jr. for Defendants Panda-Rosemary Corporation and Panda-Rosemary, L.P.*

**I.**

{2} A significant number of facts are not in dispute in this matter. Plaintiff, The Bibb Company ("Bibb"), and Defendant, Panda Energy Corporation ("Panda Energy"), entered into a Cogeneration Energy Supply Agreement in January 1989, which provided for Panda Energy to construct and operate a "cogeneration facility" adjacent to Bibb's textile mill in Roanoke Rapids, North Carolina known as the "Rosemary Complex." A "cogeneration facility" is a power plant that produces useful energy in the form of electricity and steam. Typically, a cogeneration facility will enter a Power Purchase Agreement ("PPA") to provide electricity to a nearby utility and contemporaneously will enter a contract to provide energy to a "thermal host." In this case, Panda Energy entered into a PPA with the Virginia Electric Power Company ("VEPCO") to provide electricity to VEPCO, and entered into the Energy Supply Agreement with Bibb to

provide energy to Bibb in the form of steam and to refrigerate, or "chill," Bibb's water. Under the PPA, Panda Energy acts as one of VEPCO's backup sources for electricity during peak periods and provides electricity to VEPCO when it is "dispatched" by VEPCO.

{3} In entering into the PPA and Cogeneration Energy Supply Agreement, Panda benefited from the federal regulatory scheme generally known as "PURPA" (the Public Utility Regulatory Policies Act). PURPA's purpose is to promote energy efficiency by giving certain breaks to power plants that provide useful energy. In order to receive these breaks under PURPA, power plants must maintain an efficiency rating known as "QF" (qualifying facility). Panda's agreement with VEPCO depended on Panda securing a long-term thermal host and on Panda's long-term provision of energy to its thermal host. Panda maintains its QF status by meeting a certain overall requirement for plant efficiency and providing a percentage of its energy output to the Rosemary Complex in the form of useful thermal energy.

{4} Through a series of assignments and guarantees, all of Panda Energy's rights, title, interest, and obligations under the Cogeneration Energy Supply Agreement were assigned to the Defendants, Panda-Rosemary Corporation and later to Panda-Rosemary, L.P. (collectively, "Panda"). On October 1, 1989, a First Amendment to the Cogeneration Energy Supply Agreement was executed by and between Panda-Rosemary Corporation, Panda Energy Corporation and Bibb. The Cogeneration Energy Supply Agreement and the First Amendment thereto are referred to herein collectively as the "CESA." The CESA provides that Panda, the "Supplier," will supply, and Bibb, the "Purchaser," will purchase, all of the Purchaser's requirements for steam and chilled water for the Rosemary Complex. Paragraph 5.01 of the CESA sets the price for steam at $1.00 per 1,000 pounds of steam for the first 45,000 pounds, and $2.50 per 1,000 pounds of steam for all steam over 45,000 pounds. Paragraphs 3.01 and 21.04 of the CESA expressly provide that Bibb is required only to purchase its actual requirements for steam and chilled water and is not required to consume any minimum quantity of steam or chilled water. Furthermore, pursuant to Paragraph 2.06(b) of the CESA Panda is required to deliver the chilled water to Bibb at 45° F. Bibb, as Supplier, estimated that the plant should normally use between 30,000 and 100,000 pounds of steam per hour. *See* Paragraph 2.02 of the CESA. In addition, although Bibb had no minimum purchase obligation, Panda was required to have the capacity to supply an annual average of 65,000 pounds of steam per hour and up to 2,000 tons of chilled water for 8,000 hours. *See* Paragraph 2.06 of the CESA. Furthermore, the CESA provides that "[d]eliveries of quantities in excess of [these stated averages] will not be required hereunder." *Id.* In summary, this is a requirements contract with no minimum and a maximum cap.

{5} Until February of 1997, Bibb purchased all of its steam and chilled water requirements for the Rosemary Complex from Panda. In February 1997, Bibb sold the Rosemary Complex to WestPoint Stevens, Inc. ("WestPoint") pursuant to an Asset Purchase Agreement dated February 13, 1997. As part of the sale of its Rosemary Complex, pursuant to an Assignment and Assumption Agreement, Bibb assigned all of the rights it possessed under the CESA to WestPoint. Defendants acknowledge that Paragraph 21.08 of the CESA expressly permits Bibb, as Purchaser, to assign its rights under the CESA to WestPoint without the approval of Panda. However, Panda takes the position that Bibb's "rights" did not include the right to receive its requirements of steam and chilled water. WestPoint purchased the plant and equipment; it did not purchase or continue to run Bibb's operation at the plant. WestPoint did continue to operate the plant as a textile mill. As a result of the sale, Bibb ceased to have any requirements for steam and chilled water at the Rosemary Complex. WestPoint requires steam and chilled water to operate the Rosemary Complex for its business.

{6} Plaintiffs acknowledge that Paragraph 21.04 of the CESA expressly requires Bibb to cause any party to whom it sold or leased the plant to assume Bibb's obligations under the CESA, subject to Defendants' approval, if such buyer or lessee had requirements for steam or chilled water. Accordingly, Bibb required WestPoint, as part of the sale of the Rosemary Complex, to assume all of Bibb's obligations to Defendants under the CESA, subject to Panda's approval. For the purposes of this motion only, the parties do not dispute that Panda was not given the opportunity to approve the assumption by WestPoint of Bibb's obligations prior to the execution of the WestPoint-Bibb Asset Purchase Agreement. Panda has refused to approve WestPoint's assumption of Bibb's obligations.

{7} Since purchasing the Rosemary Complex, WestPoint has purchased from Panda and paid for all of its requirements for steam and chilled water, pursuant to the contract terms and at the contract price. Those payments have been accepted by Panda under protest.

{8} The concept of cogeneration produces a mutually beneficial and interdependent relationship. The operator of the cogeneration facility needs a thermal host and has a source of revenue to supplement sales of electricity. The thermal host obtains its steam at reduced costs but becomes dependent on the cogeneration facility for the host's manufacturing operation to run smoothly. In this case the thermal host also leased the land upon which the cogeneration facility was located to the operator, thus making the operator's use of its premises dependent on good relations with the host. This was a long-term requirements contract which bound the parties together for twenty-five years. This symbiotic relationship between host and operator pervades the questions surrounding interpretation of the language in these contracts.

## II.

{9} North Carolina courts recognize the use of partial summary judgment under Rule 56(d) of the North Carolina Rules of Civil Procedure to simplify cases by disposing of those issues ripe for summary judgment. N.C.G.S. §1A-1, Rule 56(d); *See Case v. Case*, 73 N.C. App. 76, 325 S.E.2d. 661, *rev. denied,* 313 N.C. 597, 330 S.E.2d 606 (1985); *Hill Truck Rentals, Inc. v. Hubler Rentals, Inc.,* 26 N.C. App. 175, 215 S.E.2d. 398 (1975). Partial summary judgment is appropriate in this case where the parties seek the Court's interpretation of contractual language within the four corners of the CESA between Bibb and Panda.

{10} Because the parties agree that the CESA is unambiguous, and because the effect to be given unambiguous language in a contract is a question of law for the Court, there is no genuine issue of material fact as to some of the issues relevant to the pending cross motions for partial summary judgment. *See Runyon v. Paley*, 331 N.C. 293, 305, 416 S.E.2d 177, 186 (1992), *rev. denied,* 337 N.C. 699, 448 S.E.2d 541 (1994) (citing *Lane v. Scarborough*, 284 N.C. 407, 200 S.E.2d 622 (1973) (interpretation of unambiguous language is a question of law for the court); s*ee also*, *Hagler v. Hagler*, 319 N.C. 287, 294, 354 S.E.2d 228, 234 (1987); *First-Citizens Bank & Trust Co. v. 4325 Park Rd. Associates, Ltd.,* 515 S.E.2d 51, 54 (N.C. App.), *rev. denied,* 1999 N.C. LEXIS 965 (N.C. 1999); *Department of Transp. v. Idol,* 114 N.C. App. 98, 100, 440 S.E.2d 863, 864 (1994); *Cleland v. Children's Home , Inc.,* 64 N.C. App. 153, 156, 306 S.E.2d 587, 589 (1983) (all recognizing the well established principle that plain and unambiguous language in a contract is to be interpreted by the court as a matter of law).

## III.

{11} As a preliminary issue, this Court is asked to determine whether the substantive law of North Carolina, Texas, or some other state applies to the CESA.[fn1] The choice of law inquiry is governed by the Uniform Commercial Code ("UCC") because the CESA involves a contract for the sale of goods. N.C.G.S. § 25-2-102.

{12} Under the UCC, the term "goods" is defined as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities . . . and things in action." N.C.G.S. § 25-2-105(1); Tex. Bus. & Com. Code § 2.105. In essence, goods are all things which are movable at the time of identification to the contract for sale. *See Mulberry-Fairplains Water Ass'n v. Town of N. Wilkesboro ,* 105 N.C. App. 258, 265-66, 412 S.E.2d 910, 915, *rev. denied*, 332 N.C. 148, 149 S.E.2d 573 (1992); *Zepp v. Mayor & Council of Athens*, 348 S.E.2d 673, 677 (Ga. App.), *cert. denied* (1986); *Moody v. City of Galveston*, 524 S.W.2d 583, 586 (Tex. Civ. App. 1975).

{13} In *Mulberry-Fairplains*, the North Carolina Court of Appeals recognized that water being supplied and sold was "goods" under the UCC because "[w]hatever can be measured by a flow meter has 'movability' as that term is used in connection with the definition of goods." 105 N.C. at 266, 412 S.E.2d

at 915 (quoting N.C.G.S. § 25-2-105(1), official commentary (1986)). Thus, water was found to be movable goods as "evidenced by the fact that defendant charges plaintiff for the water it supplies by the number of gallons plaintiff consumes per month." *Id.*

{14} In this case, Paragraph 5.01 of the CESA sets the price for steam at $1.00 per 1,000 pounds of steam for the first 45,000 pounds, and $2.50 per 1,000 pounds of steam for all the steam over 45,000 pounds. Clearly, Panda measures the amount of steam supplied each month in order to determine the amount of money owed to it. This is further evidenced by Section 6 of the CESA, which states: "The purchase prices paid pursuant to '5' above shall be paid in calendar month increments within fifteen (15) days after receipt of an invoice from SUPPLIER. Payment shall be required for the actual quantity of steam and chilled water delivered during the prior month." Similarly, the CESA measures the price for chilled water supplied by Panda by the ton, and requires the provision of "up to two thousand (2,000) tons of chilled water" per year. The Court recognizes that the terms "pounds" and "tons" in this context refer to a unit of energy rather than weight. *See* Thorpe Aff. ¶ 8. Nevertheless, such terms provide a method of measurement for determining payment to Panda. Because the steam and chilled water were measured by Panda in order to receive payment, the CESA contemplates the sale of goods and the UCC should apply to the CESA. The CESA also provides in Paragraph 3.01 that Purchaser will buy all the steam and chilled water that it "consumes" at the plant. A requirements contract by its very nature implies a sale of goods, and thus the application of the UCC. *See, e.g., Monarch Photo, Inc. v. Qualex, Inc.*, 935 F. Supp. 1028 (D.N.D. 1996) ("For there to be a requirements contract, the UCC must be applicable"). Thus, the steam and chilled water should be considered "goods" and the CESA is governed by the UCC.

{15} Having determined that the UCC applies, the Court must look to the UCC's provision regarding which state's law governs the disputes before the Court. The UCC permits the parties to a contract to stipulate the governing state law, provided that state has a reasonable relationship to the transaction. *See* N.C.G.S. § 25-1-105(1); *Wohlfahrt v. Schneider,* 82 N.C. App. 69, 74, 345 S.E.2d 448, 451 (1986); *Kaplan v. RCA Corp.,* 783 F.2d 463, 465 (4th Cir. 1986). The parties to the CESA contracted for North Carolina to be the "Applicable Law" governing interpretation of the CESA. Section 19 of the CESA entitled "Applicable Law" references only North Carolina; Paragraph 19.01 clearly states: "This Agreement shall be deemed to be executed in the State of Texas and performable in the State of North Carolina." (strike-out in original). This reference to North Carolina as the "Applicable Law" is by definition unambiguous, and its words must be given their literal meaning.[fn2] *See Hunsinger,* 386 S.E.2d at 539, 192 Ga. App. at 783; *Coker,* 650 S.W.2d at 393; *Runyon,* 331 N.C. at 305, 416 S.E.2d at 186. Accordingly, the Court should give meaning to the language of Section 19 of the CESA and apply North Carolina law to this dispute.

{16} Even had the parties not explicitly provided for North Carolina law to govern the CESA, North Carolina law governs this dispute pursuant to the UCC's choice of law rule, which requires the application of North Carolina law to "transactions bearing an appropriate relation to this State." N.C.G.S. § 25-1-105(1). North Carolina courts interpreting this statute have held that the provision is controlling on choice of law questions in cases arising under the UCC in which the parties did not contractually select which state's law would control. *See Mahoney v. Ronnie's Rd. Service,* 122 N.C. App. 150, 468 S.E.2d 279, 281 (1996), *aff'd,* 345 N.C. 631, 481 S.E.2d 85 (1997) (citing *Bernick v. Jurden,* 306 N.C. 435, 442, 293 S.E.2d 405, 410 (1982)). The "appropriate relation standard" has been held to require courts to apply North Carolina law when North Carolina has the "'most significant relationship' to the transaction in question." *See id.* (quoting *Boudreau v. Baughman,* 322 N.C. 331, 338, 368 S.E.2d 849, 855 (1988)). In determining which state bears the "most significant relationship" to the dispute, courts look to the place of sale, manufacture, distribution, delivery, and use of the product, as well as the place of injury. 322 N.C. at 338, 368 S.E.2d at 855-56; 122 N.C. App. at 154-55, 468 S.E.2d at 282.

{17} In the case at hand, North Carolina bears the most significant relationship to the CESA and the dispute arising thereunder, therefore compelling the application of North Carolina law pursuant to N.C.G.S. § 25-1-105. North Carolina is the site of the manufacture, sale, delivery and consumption of the steam and chilled water sold under the CESA, as well as the site of the alleged injuries. The CESA's

"most significant" and "appropriate" geographic relationship is to North Carolina, and it should thus be governed by North Carolina law. N.C.G.S. § 25-1-105; *Boudreau*, 322 N.C. at 338, 368 S.E.2d at 855-56; *Mahoney*, 122 N.C. App. at 154-55, 468 S.E.2d at 281-82.

## IV.

{18} The Court must next determine what rights Bibb possessed and could assign to a purchaser of the Rosemary Complex.

{19} Bibb contends that it is entitled to summary judgment based upon an interpretation of the CESA that holds that it had the right to assign to a purchaser of the Rosemary Complex the right to purchase the new owner's steam and chilled water requirements at the Rosemary Complex on the terms and conditions in the CESA.

{20} On the other hand, Panda contends that it is entitled to summary judgment based upon an interpretation of the CESA that holds that Bibb did not have any right to purchase steam and chilled water under the agreements and thus could not assign any such right to a purchaser of the Rosemary Complex. Alternatively, Panda argues that it had the right to reject assignment of Bibb's contract rights to any purchaser of the Rosemary Complex for any reason.

{21} For the reasons set forth below, the Court concludes that neither side is correct and that Bibb possessed the right to assign to a purchaser of the Rosemary Complex the right to purchase the new owner's requirements for steam and chilled water, but that that right was subject to the approval of Panda. Panda's right to approve was subject to the standard of good faith and fair dealing. It was not an unfettered right to reject a purchaser for any reason it chose.

## A.

{22} The CESA explicitly permits Bibb to assign all of its rights without approval and without limitation. Paragraph 21.08 is unambiguous:

> This AGREEMENT shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and assigns, in accordance with the terms hereof. Either party hereto and [sic] may assign its rights hereunder without approval but may not delegate its obligations without the express written approval of the other party. (emphasis supplied)

{23} Panda admits that Paragraph 21.08 gave Bibb the ability to assign to WestPoint whatever rights it had under the CESA, but contends that Bibb had no right to purchase steam and chilled water, only an obligation to do so. This position defies reason and common sense. A requirements contract is generally defined as a contract in which the seller promises to supply all the specific goods or services which the buyer may need during a certain period at an agreed price in exchange for the promise of the buyer to obtain his required goods or services exclusively from the seller. *See Black's Law Dictionary* 1304 (6th ed. 1990) (citing *Bank of Am. Nat'l Trust & Sav. Ass'n v. Smith*, 336 F.2d 528, 529 (9th Cir. 1964). Although the buyer does not agree to purchase any specific amount, the requisite mutuality and consideration for a valid contract is found in the legal detriment incurred by the buyer in relinquishing his right to purchase from all others except from the seller. *See Propane Industrial, Inc. v. General Motors Corp.,* 429 F.Supp. 214, 218 (W.D. Mo. 1977). Thus, in this case, Panda's promise to supply Bibb's requirements corresponds to Bibb's right to receive the same. Bibb's obligation under the CESA was to obtain its steam and chilled water exclusively from Panda. A purchaser's promise under a requirements contract is not a promise to buy or to sell any specific amount of the goods; rather, it is a promise not to buy such goods from a third party. *Id.* § 569. In this case, Bibb promised not to supply its own steam and chilled water. In return, Panda made a promise to sell and deliver all such goods as the buyer may order within reason and in good faith (subject to the maximum cap). *Id.*

{24} It is clear that Bibb's primary right under the CESA was the right to obtain all of Bibb's requirements for steam and chilled water for twenty-five years at the fixed contract price.[fn3] The corresponding purchase obligation insures that Panda will receive payment for all the steam and chilled water it supplies and Bibb consumes. To hold otherwise would require the Court to give no effect to Paragraph 13.01(vii) of the CESA, pursuant to which Bibb had the right to declare Panda in default if it failed to supply the minimum quantities of steam or chilled water specified in the CESA. This Court must construe a contract in a manner that gives effect to all of its provisions. *Johnston County, N.C. v. R.N. Rouse & Co., Inc.*, 331 N.C. 88, 94, 414 S.E.2d 30, 34 (1992). This Court cannot condone a contract interpretation that would render contract provisions meaningless. *McDonald v. Medford,* 111 N.C. App. 643, 433 S.E.2d at 231 (1993).

{25} If Bibb had been purchased by Dan River, Inc. (as it subsequently was) and had continued its operations at the Rosemary Complex without materially changing its operations, there can be no doubt that Bibb could have assigned its rights to receive steam and chilled water at the contract price to Dan River or any other successor company which continued Bibb's operations at the facility. In order to protect Bibb's power to buy steam and chilled water needed to operate the Rosemary Complex at the fixed price set forth in the contract, that very purchase right must be freely assignable, and Paragraph 21.08 made it so. Although the express terms of the CESA control this case, the UCC contemplates and attempts to facilitate the assignability of requirements and output contracts when a business is sold by providing that acceptance of the assignment by the assignee constitutes an assumption of the assignor's duties under the contract, and that if the contract remains in force, "requirements in the hands of the new owner continue to be measured by the actual good faith . . . requirements under the normal operation of the enterprise prior to sale." *See* N.C.G.S. § 25-2-210(4) (1999); N.C.G.S. § 25-2-306 (official commentary 1999).

**B.**

{26} Panda takes the position that it was a breach of contract for Bibb to sell the facility without its approval. That position is without merit. Bibb clearly had the power to sell the Rosemary Complex without Panda's approval. First, there is no paragraph that gives the "Supplier" of steam and chilled water any right to approve a sale or lease of the plant it neither owns nor controls. Second, Paragraph 21.04 of the CESA assumes such a sale or lease without a veto right:

> Should the Plant be sold or leased to a third party at any time during the term hereof and should the operation of the Plant (after such sale) require the consumption of steam and/or chilled water, PURCHASER shall (subject to SUPPLIER's approval) require the purchaser or lessee thereof to assume the obligations of this AGREEMENT.

It is clear from the language of this provision that sale of the plant and the required consumption of steam and/or chilled water are conditions precedent to the duty to require the buyer of the plant to assume the obligations under the CESA and to seek Supplier's approval for that assumption. Despite the unambiguous language of paragraph 21.04, the Defendants contend that Bibb was required to obtain Panda's consent prior to its sale or lease of the Rosemary Complex. Defendants' argument can only rely on an incorrect interpretation of Paragraph 21.04, in which Defendants read the parenthetical "subject to supplier's approval" to qualify a clause in which it does not appear, i.e., "[s]hould the plant be sold or leased to a third party." Further, this construction would turn the condition precedent into the promise. This false construction contravenes basic rules of English grammar and the well-settled law that requires the court to give the language its ordinary meaning and read the language in the only reasonable light. *See C. D. Spangler Constr. Co. v. Industrial Crankshaft & Eng'g. Co.*, 326 N.C. 133, 142, 388 S.E.2d 557, 563 (1990); *Hunsinger,* 386 S.E.2d at 539; 192 Ga. App. at 782.

{27} The CESA's grant of the power to assign to a purchaser of the business the right to buy a textile plant's steam and chilled water requirements makes no sense without the same power to sell or lease the plant that generates those requirements, nor should the CESA be read to give a supplier of a commodity the right to tie up the plant owner's ability to sell a textile mill representing a major asset of the corporation for 25 years absent clear and unambiguous language granting that power. Bibb extends its right of assignment argument to encompass the right to assign the right to purchase steam and chilled water at the contract price to *any* purchaser of the Rosemary Complex. In other words, Bibb would have the Court interpret the contract to read that the *requirements* were those of the *facility* and not Bibb as the owner and operator of the facility. Panda objects to that interpretation.

{28} The Court agrees that Bibb did not have the unfettered right to assign its rights to purchase steam and chilled water to any purchaser of the plant. This decision is based upon the specific language of the CESA, the nature of the relationship between the parties, a review of the agreement in its entirety and the application of well-accepted contract law.

{29} Bibb's rights under the CESA included the right to have its requirements met. When Bibb sold the plant (as opposed to the enterprise) to WestPoint, it no longer had any requirements, and thus there was no practical right for Bibb to assign. Therefore, upon the sale of the plant, Bibb could not transfer to WestPoint the right to receive Bibb's requirement for steam and chilled water. The language of Section 21.04 quoted above clearly contemplates approval by Panda prior to effective assignment of the contract to a purchaser of the facility. The parenthetical phrase "subject to SUPPLIER's approval" appearing in that section cannot be interpreted in any other way. Section 21.04 deals specifically with the factual situation at hand. Bibb has sold the Rosemary Complex (the Plant) to a third party and that third party requires steam and chilled water. The general language of Section 21.08, permitting Bibb to assign its rights, must yield to the specific language of Section 21.04, which addresses the possibility that Bibb could sell the plant without selling its enterprise.

{30} The relationship between the parties and the structure of the entire agreement support such an interpretation. Panda required an acceptable thermal host to maintain its standing as a "qualifying facility" under PURPA. It would make no sense for Panda to agree to provide steam and chilled water to a party who might not qualify as an acceptable thermal host. Nor could it agree to provide steam and chilled water to a thermal host whose requirements interfered with or negatively impacted its ability to sell electricity as required by its contract with VEPCO. Common sense dictates that Panda would want to be protected from assignment to a third party that entailed such adverse consequences.

{31} The Court's interpretation of the contract is also supported by application of general principles of contract law involving requirements contracts. In addressing assignment of requirement contracts, Corbin explains as follows:

> There are other contracts in which one party promises to supply and the other party promises to buy all of the latter's needs or requirements. There is no doubt that the former party has the power to assign his right to payment; and in many cases the performance promised by him is not so personal as to prevent him from delegating it to another. There is no doubt, either, that the latter party, the buyer, can assign the right that his needs and requirements shall be supplied. But observe that it is his own needs and requirements that are to be supplied, not those of the assignee; he cannot by assignment change in any material way the performance to be rendered by the other party.

Arthur L. Corbin, *Corbin on Contracts*, § 884 (1993). The rationale behind this rule is that where obligations to be performed under a contract involve a degree of personal skill and confidence then it must

have been intended by the parties that the obligations would not be performed by a third party to the contract. *See Goldschmidt & Loewenick, Inc. v. Diamond State Fibre Co.*, 186 A.D. 688, 695, 174 N.Y.S. 800, 805 (1919).

{32} Whether the rights or duties are too personal to be assigned turns upon the intention of the parties. *See* 6 Am. Jur. 2d *Assignments* § 29 (1999). The nature of an agreement between a qualifying facility and a thermal host support the conclusion that Bibb's right to purchase steam and chilled water was personal to Bibb's enterprise and could not be freely assigned to a purchaser of the plant. Thus, this Court concludes that Panda had the right to approve the assignment to WestPoint of Bibb's contract rights to steam and chilled water prior to that assignment becoming effective.

**D.**

{33} Panda contends that its right to approve the assignment to WestPoint was unencumbered in any way and that it could reject WestPoint without reason or justification. Panda's position is without merit.

{34} Every contract governed by the UCC imposes upon the parties an obligation of good faith in its performance or enforcement. *See* N.C.G.S. § 25-1-203. In cases involving a lessor's withholding of consent to the assignment of a lease, the courts have found that there is an implied duty of good faith, even absent a provision prohibiting the unreasonable or arbitrary withholding of consent. *See, e.g., Prestin v. Mobile Oil Corp.*, 1984 U.S. App. LEXIS 19217 (9th Cir. 1984); *Schweiso v. Williams*, 150 Cal. App. 3d 883; *Pacific First Bank v. The New Morgan Park Corp.*, 319 Ore. 342, 876 P.2d 761 (1994). The duty of good faith requires a party to exercise discretion reasonably and in a manner consistent with the parties' expectations. *Management Services of Illinois, Inc. v. Health Management Systems, Inc.,* 907 F.Supp. 289, 295 (C.D. Ill. 1995). The question of whether consent was unreasonably withheld involves questions of fact that were not before the Court and thus is reserved.

{35} The application of the duty of good faith and fair dealing in the context of this requirements agreement is consistent with general contract law which focuses on the materiality of the differences in the performance required when a requirements contract is assigned. However, Corbin recognizes that there are requirements contracts

> in which the extent and character of the performance to be rendered are fixed with a reasonable degree of certainty by matters not affected by an assignment . . . . In such cases, the assignor does not attempt by his assignment to change the extent and character of the performance; he does not attempt to substitute a new party's needs and requirements for his own . . . . Thus, a contract to supply the needs and requirements of a specific factory, plant, or going concern is one where the extent of the performance is usually not dependent upon the personality of the owner who makes the contract. Usually, some variation in the extent of performance, due to ordinary changes in plant, personnel, or in business conditions, is contemplated by the parties when the contract is made . . . . <u>In cases of this type, the problem to be solved is whether the performance to be rendered by the obligor is materially affected by the change in ownership and management.</u> (emphasis supplied)

Arthur L. Corbin, *Corbin on Contracts* § 884 (1993). *See also* N.C.G.S. § 25-2-306, which provides:

> A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise

comparable prior output or requirements may be tendered or demanded.

{36} For example, if the purchaser of the Rosemary Complex converted it to a dyeing and finishing operation that had significantly different requirements and uses for steam and chilled water than a weaving plant, and the new requirements would impair Panda's ability to meet its electricity supply obligations to VEPCO, such a change would be material and could support a good faith refusal to agree to the assignment. On the other hand, if there was no material change in Panda's required performance and if Panda's refusal was being used solely to extract a higher price for steam or chilled water, such refusal would not be in good faith. Between those ends of the spectrum, many issues could arise with respect to uses by a new purchaser. However, both parties would have a vested interest in resolving those issues. WestPoint would be adversely affected by having to restart the old boilers and supply its own steam. Panda would be adversely affected by the loss of a thermal host.

{37} Materiality must be assessed by looking at the terms of the contract. This contract contained stated estimates of quantities to be provided. There was no minimum and there was a maximum cap. Those contract provisions could be significant in determining materiality of different uses by a new occupant of the Rosemary Complex. In any event, the materiality of the differences in performance required by the new occupant, viewed in light of the existing contract terms, would provide the most significant, but not the only, determinant of good faith. Issues of materiality and good faith are generally fact intensive and not appropriate subjects for summary judgment.

{38} Furthermore, the requirement that Bibb condition any sale of the Rosemary Complex upon the purchaser's acceptance of the CESA carries with it a contractual duty on the part of Panda to make its approval determination in good faith and a spirit of fair dealing. Absence of a good faith requirement would mean that a new owner would not only be committed to the fixed contract price with no ability to negotiate a lower price, but would also be subject to Panda's demand to raise the price if the new owner did not want to restart the old boilers.

**E.**

{39} Paragraph 21.04 of the CESA required Bibb to cause any party to whom it sold or leased the Rosemary Complex and whose operation of the plant required steam and/or chilled water to assume Bibb's obligations under the CESA, subject to Panda's approval. Because Bibb sold the Rosemary Complex to WestPoint, and because WestPoint does have a need for steam and chilled water at the Rosemary Complex, Bibb had the duty to compel WestPoint to assume Bibb's obligations. It is an undisputed fact that Bibb required WestPoint to assume all of Bibb's obligations to Defendants under the CESA, subject to Panda's approval, and WestPoint agreed to do so. As a result, WestPoint became obligated to purchase any steam and chilled water which it required at the Rosemary Complex – again, subject to Panda's approval. Nothing in the language of Paragraph 21.04 required Bibb to seek Panda's approval prior to requiring WestPoint to assume its obligations.

{40} There has been no breach of contract arising out of Bibb's attempt to require WestPoint to assume Bibb's obligations under the CESA. Under North Carolina law, an assignment is deemed ineffective if a required consent is not obtained. *See Edgewood Knoll Apartments, Inc. v. Braswell*, 239 N.C. 560, 80 S.E.2d 653, *reh'g denied*, 240 N.C. 760, 83 S.E.2d 797 (1954) (concluding that assignment of bond was incomplete when consent of surety was required for assignment and was not given). If the Defendants validly withheld consent, the result is that the assignment was ineffective and the obligations under the CESA remain with Bibb under North Carolina law.

{41} The Asset Purchase Agreement between Bibb and WestPoint echoes the common law, and provides that an *ineffective assignment* of obligations will have no effect on the parties' rights, duties and obligations under the CESA. Paragraph 6.16(a) of the Asset Purchase Agreement provides as follows:

> *To the extent that* any Assumed Contract is not capable of being transferred or
> assigned by Seller to Buyer (a "Transfer") without the consent, approval or

waiver of a third party or other entity, or if such Transfer or attempted Transfer would constitute a breach of such Assumed Contract or a violation of any law, statute, rule, regulation, ordinance, order, code, arbitration award, judgment, decree or other legal requirement of any governmental entity, nothing in this Agreement will constitute a Transfer or an attempted Transfer thereof. (emphasis added).

Pursuant to this language, if, as claimed by the Defendants, their refusal to approve WestPoint's assumption of Bibb's obligations was proper, then Bibb's rights have not been assigned, but Bibb remains obligated to the Defendants under the CESA, and no breach of the CESA has occurred as a result of WestPoint's attempted assumption thereof, notwithstanding Defendants' refusal to grant their consent to such assumption.

{42} The result of an ineffective assignment of obligations is not that Bibb breached the CESA. The mere attempt to assign its obligations to WestPoint was not a breach which caused damage, nor does it give Defendants the right to renegotiate the contract and extort a higher price from WestPoint for steam and chilled water. A breach of contract occurs when a party materially fails to perform an obligation under the contract. *See Millis Constr. Co. v. Fairfield Sapphire Valley, Inc.*, 86 N.C. App. 506, 510, 358 S.E.2d 566 (1987). Whether or not WestPoint assumes Bibb's obligations, there can be no damage to Defendants because under North Carolina law and the WestPoint-Bibb Asset Purchase Agreement, Bibb is still bound by the CESA. Accordingly, Panda cannot show any material breach of contract or damages. In fact, Defendants are in the same position now that they would have been in had Bibb never assigned the CESA. There is no breach arising out of WestPoint's attempted assumption of Bibb's obligations.

**F.**

{43} The CESA and the right to assign all rights thereunder are unique, irreplaceable and invaluable assets. Therefore, Bibb and WestPoint cannot be compensated adequately in money damages if it is determined that Defendant's refusal to acknowledge the assignment of Bibb's rights under the CESA to WestPoint is wrongful. Because a present, actionable and justiciable controversy exists with respect to the legal rights between the parties under the CESA, including the rights and obligations of Bibb, WestPoint and the Defendants thereunder, the use of declaratory judgment in this case is proper. *See Blades v. City of Raleigh,* 280 N.C. 531, 544, 187 S.E.2d 35, 42-43 (1972); *Integon Indem. Corp. v. Universal Underwriters Ins., Co.,* 131 N.C. App. 267, 507 S.E.2d 66, 68 (1998); *MGM Transp. Corp. v. Cain,* 128 N.C. App. 428, 430, 496 S.E.2d 822, 824 (1998).

**Conclusion**

{44} Cogeneration arrangements are inherently symbiotic relationships. Each party must be protected from being in business with a partner who could significantly impact its operation. On the other hand, both the textile industry and the energy supply industry are undergoing radical change which dictates that each party to a long-term contract governing cogeneration must have flexibility to restructure and change ownership. The imposition of the good faith and fair dealing requirement in connection with the approval of the right to assign provides the flexibility which the parties need to respond to changes within their own industries while preserving the basis for a sound working relationship. In this case, if Bibb and WestPoint can prove that Panda's refusal to agree to the assignment of Bibb's contractual rights to receive steam and chilled water at the contract price was a breach of its duty of good faith and fair dealing, they will be entitled to relief. If Panda did not violate its duty of good faith and fair dealing, Panda and WestPoint will be left to either negotiate a new contract or each go their separate ways. Bibb will have no "requirements" for steam and chilled water at the Rosemary Complex.

{45} **WHEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**

1. Plaintiffs' motion for partial summary judgment as to Defendants' counterclaim that Bibb breached the express terms of the CESA is hereby

GRANTED.

2. Plaintiffs' motion for partial summary judgment on Counts I and II of the Second Amended Complaint is hereby GRANTED, and the Court enters the following declaratory judgment:

> a. Pursuant to Section 21.08 of the CESA, Bibb had the right to assign its rights under the CESA to WestPoint without Defendants' consent; therefore, Bibb did not breach the CESA by assigning its rights thereunder to WestPoint;

> b. Pursuant to Section 21.04 of the CESA, Bibb had the right to sell the Rosemary Complex to WestPoint without Defendants' consent; therefore, Bibb did not breach the CESA by selling the Rosemary Complex to WestPoint; and

> c. The Defendants' right to approve Bibb's assignment to WestPoint of its rights to receive steam and chilled water under the CESA is subject to a contractual duty of good faith and fair dealing, and genuine issues of material fact exist with respect to Plaintiffs' claim that Defendants breached that duty.

3. Defendants' Motion for Partial Summary Judgment is hereby GRANTED to the limited extent Defendants seek a determination that Defendants possessed the right to approve assignment to WestPoint of the contract rights to receive WestPoint's requirements for steam and chilled water at the contract price. In all other respects Defendants' Motion for Partial Summary Judgment is DENIED.

This the 16th day of December, 1999.

## CERTIFICATION

Pursuant to Rule 54 of the North Carolina Rules of Civil Procedure, the Court certifies

that there is no just reason for delay in entering this Order or the appeal therefrom

This the 16th day of December, 1999.

Footnote 1 In fact, the choice of law issue is important with respect to only one question. Both Texas and North Carolina law hold that interpretation of unambiguous contract language is for the court as a matter of law. *See Croker v. Croker,* 650 S.W.2d 391, 393 (Tex. 1983); Davis v. Dennis Lilly Co., 330 N.C. 314 (1991). Defendants contend that outside of the UCC, Texas does not recognize a duty of good faith and fair dealing. North Carolina clearly does. *See Claggett v. Wake Forest Univ.* , 126 N.C. App. 602 (1997). The importance of this issue becomes clear in Section IV.C. below. For the reasons stated below, this Court finds that the UCC applies, and accordingly that the parties were bound by a duty of good faith and fair dealing. *See* N.C.G.S. § 25-1-203; Tx. Bus. & Com. Code § 1-203. For purposes of this opinion, the Court need not decide whether Texas would recognize a duty of good faith and fair dealing outside of the UCC.

Footnote 2 On the issue of the parties' intent in drafting the CESA to provide for the applicable state law, this Court will not consider the parole evidence contained in Defendants' briefs. Under North Carolina

law, "Where the language is clear and unambiguous, the court is obliged to interpret the contract as written, . . . and cannot, under the guise of construction, 'reject what the parties inserted or insert what the parties elected to omit.'" *Corbin v. Langdon*, 23 N.C. App. 21, 25, 208 S.E.2d 251, 254 (1974) (quoting *Weyerhaeuser Co. v. Carolina Power & Light Co.*, 257 N.C. 717, 719, 127 S.E.2d 539, 540 (1962), and citing *Root v. Allstate Ins. Co.*, 272 N.C. 580, 158 S.E.2d 829 (1967)). However, it is telling that numerous assignments, leases, and other documents which Panda entered into subsequent to the Cogeneration Energy Supply Agreement which relate to Panda's rights and obligations thereunder explicitly invoke the application of North Carolina law. It would make no sense for these documents, which indisputably bear on the rights and obligations under the CESA, to be governed by North Carolina law if the Defendant believed the underlying rights and obligations were in fact governed by Texas law.

Footnote 3 Panda argues that Bibb had no right to receive steam or chilled water at a fixed price. Certainly the fixed prices were bargained for by Bibb. If Panda had attempted to raise its price as against Bibb, Bibb would have had an enforceable right to the fixed price. To argue that the fixed prices for Bibb's requirements are not rights of Bibb ignores reality. Panda did have the benefit of a cap on its obligations.